323 P.3d 792

Raymond **GURROBAT**, individually and on behalf of all others similarly situated, Petitioner/Plaintiff–Appellee/Cross–Appellant,

v.

**HTH CORPORATION**; Pacific Beach Corporation, Respondents/Defendants–Appellants/Cross–Appellees.

**No. SCAP–12–0000764.**

Supreme Court of Hawai'i.

Feb. 25, 2014.

James J. Bickerton, John F. Perkin, and
Brandee J.K. Faria, Honolulu, for petitioner.

Paul Alston, Tina L. Colman and John
Rhee, Honolulu, for respondent.

Opinion of the Court by McKENNA, J.

## I. Introduction

This case arises from a class action lawsuit filed against HTH Corporation and Pacific Beach Corporation (collectively, "Defendants"), in which Raymond Gurrobat ("Gurrobat"), individually and on behalf of a class of similarly situated persons ("Plaintiff Class"), asserted claims of unlawful withholding of wages under Hawaiʻi Revised Statutes ("HRS") §§ 388-6 and 388-10, and unfair methods of competition ("UMOC") under HRS §§ 480-2(e) and 480-13(a). Gurrobat's claims were based on alleged violations of Hawaii's hotel or restaurant service charge law, HRS § 481B-14 (2008). Pursuant to HRS § 602-58(b)(1) (Supp.2011), we accepted a discretionary transfer of this case from the Intermediate Court of Appeals.

Gurrobat alleged that Defendants charged service charges to customers of the Pacific Beach Hotel and the Pagoda Hotel, but failed to distribute the entirety of those service charges to service employees and failed to disclose to customers its practice of retaining a portion of those charges. The Circuit Court of the First Circuit ("circuit court")[1] granted summary judgment in favor of Gurrobat on the claim of unlawful withholding of wages, but in favor of Defendants on the UMOC claim.

1. The Honorable Karl K. Sakamoto presided.

On appeal, Defendants argued that the circuit court erred in: (1) granting Gurrobat's motion for class certification because he never worked at the Pagoda Hotel and he failed to establish that he would be an adequate representative of the class under Hawaiʻi Rules of Civil Procedure ("HRCP") Rule 23; (2) granting summary judgment in favor of Gurrobat on the claim for unpaid wages under HRS § 388–6 because he failed to show that Defendants withheld wages "earned" by class members; (3) granting double damages and attorneys' fees/costs, and in concluding that the Plaintiff Class were entitled to those portions of the service charge income Defendants had paid to management employees; (4) imposing joint and several liability against Defendants; (5) granting final judgment in favor of Gurrobat because it was premised on a manifest error of fact concerning Defendants' status as an "employer"; and (6) denying Defendants' motion for reconsideration on the basis of judicial and equitable estoppel with regard to joint and several liability because neither party requested the imposition of joint and several liability and it was only first mentioned in the Final Judgment.

On cross-appeal, Gurrobat argued that the circuit court erred in granting summary judgment to Defendants under HRS § 480–13(a) because: (1) it applied an erroneous legal standard imposing requirements of proof not required under *Davis v. Four Seasons Hotel Ltd.*, 122 Hawaiʻi 423, 228 P.3d 303 (2010) or any other Hawaiʻi law; (2) Defendants did not carry their burden of showing that Gurrobat would be unable at trial to present evidence to establish the requisite injury under the applicable standard; and (3) the record presented genuine issues of material fact with respect to whether Gurrobat had the requisite injury for a HRS § 480–13(a) claim.

We hold that the circuit court did not err with respect to the issues of: class certification, Gurrobat's claim for unpaid wages under HRS Chapter 388, the award of double damages and attorneys' fees and costs, and Defendants' status as an "employer." However, we hold that the circuit court erred in imposing joint and several liability against the Defendants, and also erred in denying Defendants' motion for reconsideration on the basis of judicial and equitable estoppel with respect to the issue of joint and several liability.

Specifically, we hold the following on the issues raised by the Defendants: (1) Gurrobat established that he could fairly and adequately protect the interests of the class members; (2) a service charge is compensation "earned" as tip income under HRS Chapter 388; (3) the Plaintiff Class was entitled to the portion of the service charges that Defendants paid to "management employees," and to double damages and attorneys' fees/costs because there was no equitable justification for Defendants' service charge distribution practices; (4) HTH Corporation and Pacific Beach Corporation are not jointly and severally liable; (5) HTH Corporation is an "employer"; and (6) judicial and equitable estoppel did not apply to Defendants' joint and several liability arguments in its motion for reconsideration.

As to Gurrobat's cross appeal, we hold that the circuit court erred in granting Defendants' motion for summary judgment on Gurrobat's UMOC claim because Gurrobat satisfied the "nature of the competition" requirements set forth in *Davis* by alleging and proving (1) how Defendants' HRS § 481B–14 violation negatively affected competition and (2) that the injury to his property flowed from Defendants' conduct that negatively affects competition.

## II. Background

### A. Factual Background

The instant case involves a class action lawsuit, alleging that Defendants withheld tip income from non-management employees who provided food and beverage services at the Pacific Beach Hotel and the Pagoda Hotel (sometimes collectively referred to as "Hotels"). Defendants HTH Corporation and Pacific Beach Corporation together operate the Pacific Beach Hotel on Oʻahu, Hawaiʻi; and Defendant HTH Corporation operates the Pagoda Hotel on Oʻahu, Hawaiʻi. The certified Plaintiff Class consists of all non-management employees of the Hotels

who provided services in connection with the sale of food and/or beverages on and after December 8, 2004, for which a service charge or gratuity was imposed by the Hotels, and not distributed one-hundred percent to those service employees.

Gurrobat was an employee at the Pacific Beach Hotel from February 1990 until December 2007. Between December 8, 2004 and December 2007, and at other times prior to that period, Gurrobat worked as a food and beverage server at numerous banquets and other functions at the Pacific Beach Hotel. Gurrobat did not at any point work at the Pagoda Hotel; he claimed, however, that "[s]imilar functions, served by other members of the Class, took place at the Pagoda Hotel during the Class Period."

According to Defendants, the practice for distributing service charges at the Pacific Beach Hotel was generally to distribute eighty-five percent (85%) of service charges to service employees and fifteen percent (15%) to managerial employees (e.g., catering coordinator and pastry chef); the practice at the Pagoda Hotel was generally to distribute eighty-two percent (82%) of service charges to service employees and eighteen percent (18%) to managerial employees.

## B. Circuit Court Proceedings

### 1. Gurrobat's Complaint

On December 8, 2008, Gurrobat, individually and on behalf of the Plaintiff Class, filed suit against Defendants. Gurrobat alleged that, as operators of the Pacific Beach Hotel and the Pagoda Hotel, Defendants charged customers at the Hotels a "service charge" or "gratuity" that was calculated as a percentage of the total cost of food and beverage (typically, between seventeen and twenty percent), failed to distribute the entirety of these service charges to non-managerial employees who served the customers, and failed to clearly disclose to customers that portions of the service charges were not distributed to non-managerial employees. Gurrobat claimed that this practice violated HRS § 481B–14, that any violation of Chapter 481B was deemed to be an UMOC under HRS § 480–2; therefore, members of the

proposed class were entitled to treble damages under HRS § 480–13(a). Gurrobat sought (1) a declaratory judgment that Defendants' practice of retaining a portion of the service charge without clearly disclosing so to customers was an UMOC, and (2) an injunction prohibiting Defendants from further engaging in this practice.

On March 29, 2010, this court issued its decision in *Davis v. Four Seasons Hotel*, holding in part, that the "nature of the competition" must be sufficiently alleged in a complaint to bring a claim for damages under HRS §§ 480–2(e) and 480–13(a) for a violation of HRS § 481B–14. 122 Hawai'i at 425, 228 P.3d at 305.

Gurrobat then amended his complaint on May 24, 2010, supplementing his claim for damages under HRS §§ 480–2(e) and 480–13(a) by adding the following allegations regarding the "nature of the competition" affected by Defendants' conduct:

18. The competition in which Defendants are engaged or participating is the competition with other providers of hotel, restaurant and banquet services. Defendants derive an unfair advantage over their law-abiding competitors by (a) lowering their overall costs through the means of retaining tip income due under law to Plaintiff and other Class members, (b) attracting customers by being able to offer seemingly lower "base" prices than law-compliant competitors through the retention of tip income, and (c) misleading customers into believing that the service charge will be paid as tip income and thereby obtaining the business of customers through an unfair and illegal business advantage over law-compliant hotels, restaurants and banquet service providers.

19. These unfair competitive advantages were gained by Defendants at the direct expense of Plaintiff and other members of the Class, and Plaintiff and the Class members were injured as a result of Defendants' unfair method of competition and the Defendants' unfair competitive behavior in the hotel food and beverage market.

On July 15, 2013, this court issued its decision in *Villon v. Marriott Hotel Services, Inc.*, 130 Hawai'i 130, 306 P.3d 175 (2013),

holding that when a hotel or restaurant applying a service charge for the sale of food or beverage services violates HRS § 481B–14 by failing to: (1) distribute the full service charge directly to its employees as "tip income" (in other words, as "wages and tips of employees"), and (2) disclose this practice to the purchaser of the services, an employee may bring an action under HRS §§ 388–6 (1993), –10 (1993 & Supp.1999), and –11 (1993 & Supp.1999) to enforce employees' rights and seek remedies. 130 Hawai'i at 132–33, 306 P.3d at 177–78.

Gurrobat then filed a Second Amended Complaint on August 31, 2010, also asserting that based on Defendants' violation of Hawaii's wage and hour laws under HRS § 388–6 by virtue of their violations of HRS § 481B–14, he was entitled to double damages under HRS § 388–10.

Defendants filed their Answer to the Second Amended Complaint on September 10, 2010 and asserted, inter alia, that the complaint failed to state a claim upon which relief could be granted and that Gurrobat lacked standing to bring some or all of his claims. Defendants, however, admitted that they (1) charged a service charge to customers at banquets and other functions held at the Hotels, (2) generally distributed eighty-five percent (85%) of the service charge income to service employees, and (3) generally distributed the remaining fifteen percent (15%) of said service charge income to Defendants' managerial employees.

### 2. Class Certification

On February 8, 2010, Gurrobat filed a motion for class certification and for approval of class notice and dissemination plan pursuant to HRCP Rule 23.[2] He stated:

All four of the requirements of HRCP Rule 23 are satisfied here. The Class consists of in excess of 157 employees and is therefore presumptively too *numerous* to make joinder practical.... Class counsel and Mr. Gurrobat will *adequately* represent the class, who has no conflict and understands his duties and responsibilities as a class representative.... All of the Claims of the class arise from a *common* nucleus of operative facts: the putative Class consists of Defendants' employees who served customers of the Pacific Beach and Pagoda Hotel who were charged a standardized "service charge" or "gratuity" as they sometimes call it, on top of the total cost of food and beverage, typically ranging between 17% and 20%. Rather than distribute all of the service charge as mandated by HRS § 481B–14, the Defendant retained some of it without providing any disclosure to the consumers.

Mr. Gurrobat's claims are not only *typical,* they are **exactly the same** as that of the entire class. The facts and law here are not only universally *common* as to every class member, *they are* **identical,** such that Plaintiffs anticipate the Court will find by way of dispositive motion that the Defendant (sic) violated HRS § 481B–14 as a matter of law. The only issue anticipated to remain for the jury will be how much each employee should be compensated for the monies improperly from them withheld over time. This is a quintessential class action.

Accordingly, Gurrobat sought certification for the class of all past and present non-management employees of the Pacific Beach Hotel and the Pagoda Hotel who provided services in connection with the sale of food

---

2. HRCP Rule 23(a) and (b)(2) state in relevant part:

 **(a) Prerequisites to a class action.** One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

 **(b) Class actions maintainable.** An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

 ... (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole....

and/or beverages on and after December 8, 2004, for which a service charge or gratuity charge was imposed by the Hotels and not distributed one-hundred percent to said non-management employees.

Defendants filed a memorandum in opposition to Gurrobat's motion for class certification on March 1, 2010. They contended that Gurrobat's proposed class incorrectly distinguished between managerial employees and non-managerial employees while the plain language of HRS § 481B–14 made no such distinction, and that the court should make an initial determination as to whether HRS § 481B–14 required service charges to be distributed only to "non-management employees." In addition, Defendants argued that Gurrobat failed to meet the requirements for class certification under HRCP Rule 23 because he provided no basis for his estimate of the class size or his assertion that the amounts in dispute were not of sufficient magnitude for employees to bring individual lawsuits. They also argued that Gurrobat was not a proper class representative because he was only employed as a food and beverage server at the Pacific Beach Hotel for a portion of the relevant period, from December 8, 2004 through December 2007.

In a reply memorandum dated March 4, 2010, Gurrobat asserted that HRS § 481B–14 could not be construed to include non-service managerial personnel because the legislative history of the statute revealed an intent to protect those employees who rendered the service for which customers believed they were tipping and payment of "tip income" could not, therefore, extend to salaried managers. In addition, he argued that he had provided a good-faith estimate of the class size, and Defendants failed to state a basis for believing that he would not adequately represent the interests of the certified class.

After hearing arguments from the parties on March 9, 2010, the circuit court entered an order granting Gurrobat's motion for class certification and approving the class notice and dissemination plan on March 25, 2010. The certified Plaintiff Class consisted of:

> All past and present non-management employees of the Hotels who, on and after December 8, 2004, provided services in connection with the sales of food and/or beverage at the Hotels for which a service charge or gratuity charge was (a) imposed by the Hotels and (b) not distributed 100% to said non-management employees.

### 3. Defendants' Motion for Summary Judgment

Defendants filed a motion for summary judgment on October 4, 2010. They argued, among other things, that distributing a portion of the service charge to managerial employees was not a violation of HRS § 481B–14, because those employees were involved in providing banquet services, and the plain language of HRS § 481B–14 did not preclude managerial employees from receiving a portion of the service charge as tip income. Defendants also argued that Gurrobat failed to provide any evidence that Defendants' service charge distribution practices had a negative effect on competition, as required by *Davis*, 122 Hawai'i 423, 228 P.3d 303.[3] Finally, they argued that the legislative history of HRS § 481B–14 precluded Gurrobat from asserting a claim for unpaid wages because service charges were not "tips or gratuities of any kind," and Defendants had not retained any compensation "earned" by members of the Plaintiff Class.

---

**3.** Defendants asserted:

In this case, Plaintiff does not have any evidence to support his allegation that the actions of HTH Defendants negatively affected competition.... Indeed, Plaintiff's lack of evidence is a result of the simple fact that every other hotel was doing the same thing that HTH Defendants were doing. In fact, the eighty-five percent (85%)/fifteen percent (15%) split used by [Pacific Beach Hotel] in distributing service charges is a standard provision found in many Unite Here! Local 5 Union contracts. The

Waikiki hotels that contain such a provision in their current union contract that HTH Defendants are aware of include: (1) Hilton Hawaiian Village; (2) Sheraton Waikiki Hotel; (3) Sheraton Moana Surfrider Hotel; (4) Sheraton Princess Kaiulani Hotel; (5) Queen Kapiolani Hotel; (6) Hale Koa Hotel (75/25 split); (7) Hyatt Regency Waikiki Resort & Spa; (8) Waikiki Beach Marriot Resort & Spa; (9) Kahala Hotel; (10) Royal Hawaiian Hotel; and (11) Ala Moana Hotel.

Gurrobat filed a memorandum in opposition to Defendants' motion for summary judgment on October 20, 2010. He argued that Defendants were not entitled to summary judgment because it was undisputed that a portion of the service charge was not distributed to either service employees or managers, as required by HRS § 481B–14 and, in any event, managerial employees were not entitled to share in the distribution of service charges. Gurrobat also argued that, even if he could not identify a law-compliant competitor who distributed the entire service charge to its service employees, he had satisfied the requirements of *Davis*, 122 Hawai'i 423, 228 P.3d 303, because his expert witnesses could identify the "nature of the competition" and the negative impact on competition caused by Defendants' practice of retaining a portion of the service charge.[4] Finally, he argued that neither the language nor the legislative history of HRS § 481B–14 precluded the use of HRS § 388–6 as a mechanism to enforce employees' right to receive tip income.

In a reply memorandum filed on October 25, 2010, Defendants reiterated that Gurrobat was required to prove that the Hotels' service charge distribution practices had an anti-competitive effect, that his expert witnesses were unaware of whether the Hotels had gained a competitive advantage as a result of these practices, and that these witnesses could not identify a single hotel that distributed the entire service charge to its service employees.

After hearing arguments on this motion on November 17, 2010, the court concluded that there were no genuine issues of material fact, and that Gurrobat failed to present evidence of an anticompetitive injury where the testimony of his two expert witnesses were not sufficiently based on facts. It explained:

> The Court agrees with defendant's position here. The standards are provided in *Davis v. Four Seasons*. Basically the plaintiff must still allege and prove anti-trust injury by alleging the nature of competition in order to ensure that the injury results from a competitive-reducing aspect or effect of defendant's behavior.
>
> It's not that plaintiffs don't have a basis or a cause of action to raise. The Court is ruling basically on there being no material issue of fact with regard to the evidence that will be introduced to support the anti-competitive injury aspect of the case.
>
> And specifically foundationally the Court believes that the expert or the plaintiff's two experts had to have at least a foundation in fact or evidence of one or the other of the following:
>
> One, that there was another hotel that either did not require service charges or required service charges and then distributed 1009[sic] percent of them to its service employees or disclosed the withholding to its customers. And basically the two experts had no knowledge of an existent market at all or the existence of any hotel that could provide either one of those two.
>
> On that basis, the opinions were not minimally based on facts. And for that reason, the defendant's motion is granted.

On December 2, 2010, the court entered an order granting summary judgment in favor of Defendants on Gurrobat's UMOC claim under HRS § 480–2, but denying summary judgment on the claim for unpaid wages under HRS § 388–6.

### 4. Gurrobat's Motion for Partial Summary Judgment

Gurrobat filed a motion for partial summary judgment as to Defendants' violation of HRS Chapter 388 on October 4, 2010. He argued that he was entitled to judgment as a matter of law where, according to Defen-

---

4. Gurrobat explained:
 Plaintiff has two expert witnesses who will identify the "nature of the competition" and describe the impact on competition of Defendants helping themselves to the tip income that belongs to Plaintiff and the Class. Long-time isle hotelier Andre Tatibouet and Bank of Hawaii's now-retired chief economist Paul Brew-baker are serving as Plaintiff's experts and have provided the relevant opinions that any hotel that complies with the law by distributing the entire service charge has higher labor costs and pricing structure than Defendants and is therefore at a competitive disadvantage to Defendants.

dants' own admissions, a portion of the service charge income was not distributed directly to service employees as required by HRS § 481B–14, and this practice was not clearly disclosed to customers paying the service charge.

Defendants filed a memorandum in opposition to Gurrobat's motion on October 20, 2010. They argued that HRS § 481B–14 provided the exclusive remedy for Gurrobat's claims, and that the legislative history revealed a decision not to permit such claims under HRS § 388–6. Defendants also argued that the service charge did not constitute "tips or gratuities of any kind" under HRS § 388–6, and that they did not retain any compensation "earned" by members of the Plaintiff Class. Finally, they argued that, even if Defendants had inadvertently withheld portions of the service charge, Gurrobat could not assert a claim for those amounts intended to be distributed to managerial employees rather than service employees.

In a reply memorandum filed on October 25, 2010, Gurrobat argued that neither the language nor the legislative history underlying HRS § 481B–14 precluded an independent claim under HRS § 388–6. He asserted that the "tip income" required to be paid to employees under HRS § 481B–14 constituted "compensation" under HRS Chapter 388, the term "employees" in HRS § 481B–14 referred to those employees who rendered the service for which the customers believed they were tipping, there was no genuine issue of material fact as to whether the service charge income withheld by Defendants was "earned" by members of the Plaintiff Class, and Defendants' practice of withholding a portion of this income for managerial employees violated HRS § 481B–14.

During the November 17, 2010 hearing on this motion, the circuit court concluded that HRS § 481B–14 should be read in pari materia with HRS § 388–6, that the legislative history of this statute indicated an intent to protect service employees rather than mana-

gerial employees, that service charges constituted "compensation" under HRS § 388–6, and that Gurrobat was entitled to partial summary judgment based on the undisputed facts of this case.

On December 6, 2010, the court entered an order granting Gurrobat's motion for partial summary judgment as to the claim for unpaid wages under HRS Chapter 388. In doing so, it adopted the reasons set forth during its November 17, 2010 hearing.

### 5. Gurrobat's Motion for Summary Judgment on Damages

On May 23, 2011, Gurrobat filed a motion for summary judgment as to damages, arguing that based on Defendants' admissions and the court's ruling as to liability, there were no genuine issues of material fact regarding damages. He argued that pursuant to HRS § 388–10, the Plaintiff Class was entitled to double the service charges wrongfully withheld by Defendants and interest at a rate of six percent per year from the date when the service charges should have been paid, as well as reasonable attorneys' fees and costs.[5]

Defendants filed a memorandum in opposition to the motion on July 26, 2011. They argued that both Gurrobat's motion and the accompanying report of Thomas A. Loudat should be stricken as untimely, and also, that there were genuine issues of material fact as to the amount of damages the Plaintiff Class was entitled to recover. In addition, Defendants argued that they had equitable justification for not distributing one-hundred percent of service charge income to service employees. In addition, Defendants argued that Plaintiffs were time-barred from recovering damages for service charges paid before December 8, 2006 because pursuant to HRS § 378–5, claims for back pay were subject to a two-year statute of limitations.

In a reply brief dated July 29, 2011, Gurrobat argued that (1) the motion was timely filed more than 50 days before the scheduled

---

**5.** HRS § 388–11 provides in relevant part:
 The court in any action brought under this section shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow interest of six per cent per year from the date the wages were due, costs of action, including costs of fees of any nature, and reasonable attorney's fees, to be paid by the defendant.

trial date, (2) there were no remaining issues of fact, (3) Defendants could not claim equitable justification for violating a statute of which they had full knowledge, and (4) his claims were not limited to a two-year statute of limitations because pursuant to HRS § 657-1(4) governing "Limitation of Actions" for "Personal Actions,"[6] a six-year statute of limitations applied to Gurrobat's claim for damages.

After hearing arguments on this motion, the court entered an order on August 24, 2011, granting summary judgment as to damages and awarding $1,678,783.00 in damages to the Plaintiff Class.

### 6. The Court's Amended Final Judgment

On January 18, 2012, the court entered an order granting Gurrobat's Motion for (1) "Approval of the Plaintiff Class' Counsels' Fees and Costs to Be Paid by Defendant," (2) "Approval of the Class Representative Stipend," and (3) an "Entry of Final Judgment." The court then entered Final Judgment in favor of Gurrobat and against Defendants in the amount of $1,984,039.

### 7. Defendants' Motion for Reconsideration

Defendants filed a motion for reconsideration on January 31, 2012. They argued that Gurrobat was not entitled to summary judgment on his claim under HRS Chapter 388, because Defendants did not withhold wages "earned" by members of the Plaintiff Class;

he was not entitled to double damages or fees and costs under HRS § 388-6 because Defendants were not liable under HRS § 388-10; he failed to establish his right to hold Defendants jointly and severally liable for the wages at both hotels, and his ability to represent class members who had only worked at the Pagoda Hotel; and he failed to prove that HTH Corporation was the "employer" of class members.

The court summarily denied Defendants' motion on February 7, 2012. The court concluded that Defendants had waived any arguments not previously raised insofar as they were "based on facts that were known well in advance of the hearing for summary judgment that disposed of this case." The court also concluded that, based on the totality of the circumstances, Defendants were equitably and judicially estopped from raising new arguments regarding joint and several liability.[7]

On August 7, 2012, the court entered an Amended Final Judgment,[8] dismissing Gurrobat's UMOC claim under HRS § 480-2, and entering judgment against Defendants in the amount of $1,984,039.40 on the claim for withheld wages under HRS § 388-6.[9]

### C. Arguments on Appeal

#### 1. Defendants' Appeal Re: HRS Chapter 388

Defendants argue on appeal that the circuit court's Amended Final Judgment was

---

6. A "personal action," for the purposes of HRS § 657-1(4) has been defined as:

> an action brought for the recovery of personal property, for the enforcement of a contract or to recover for its breach, or for the recovery of damages for the commission of an injury to the person or property; an action for the recovery of a debt, or damages from the breach of contract, or for a specific personal chattel, or for the satisfaction in damages for injury to the person or property.

*Au v. Au*, 63 Haw. 210, 217, 626 P.2d 173, 179 (1981) (citations omitted).

7. The court explained:

> Throughout the entire course of this case, the Defendants have acted as one. Defendants chose to be jointly represented by the same legal counsel, filed all of their motions and oppositions together, and even shared the same representative during settlement conferences. Only after summary judgment was

granted did Defendants first make an argument based on their separate and distinct identities. Based on Defendants' conduct, the Court finds that it was reasonable for the Court to rely on such conduct in concluding that judgment should be entered against Defendants jointly. Accordingly, the Court finds that to allow Defendants to raise a new argument based on their separate legal identities would be inequitable.

8. It appears that the court entered an Amended Final Judgment because its January 18, 2012 Final Judgment did not specifically resolve all claims against all parties, as required by HRS § 641-1(a), HRCP Rule 58, and *Jenkins v. Cades Schutte Fleming & Wright*, 76 Hawai'i 115, 869 P.2d 1334 (1994).

9. The Amended Final Judgment awarded $1,678,783.00 in damages, and $305,256.40 in fees/costs, to the Plaintiff Class.

flawed for several reasons. First, they contend that the court erred in granting summary judgment on the issue of liability because a violation of HRS § 481B–14 cannot form the basis of a claim for unpaid wages under HRS § 388–6, which provides a remedy for the wrongful withholding of compensation "earned" by any employee.[10] Second, they argue that the court erred in certifying the Plaintiff Class because Gurrobat lacked standing to represent employees of the Pagoda Hotel and he failed to meet the requirements of HRCP Rule 23.[11] Third, Defendants argue that the court erred in imposing joint and several liability on HTH Corporation and Pacific Beach Corporation because there was no basis for holding Pacific Beach Corporation liable for alleged violations at the Pagoda Hotel.[12] Fourth, they argue that the court erred in granting summary judgment as to damages because the measure of damages should have taken into account the portion of service charge income distributed to both service employees and managerial employees, and the question of equitable justification involved a question of fact. Fifth, Defendants argue that the court's judgment was premised on a manifest error of fact because Gurrobat failed to present any evidence regarding HTH Corporation's status as an "employer" of class members who worked at the Pagoda Hotel.[13] Finally, they argue that the court abused its discretion in invoking judicial and equitable estoppel and denying Defendants' motion for reconsideration without addressing manifest defects in the final judgment.

In his Answering Brief, Gurrobat asserts that five of Defendants' six alleged points of errors were raised for the first time in their January 31, 2012 motion for reconsideration, and that the circuit court did not abuse its discretion in addressing these alleged errors. He argues that the court did not err in granting summary judgment on the issue of liability because "tip income" under HRS § 481B–14 constituted compensation "earned" under HRS § 388–6.[14] Gurrobat

10. Defendants assert that the court erred in equating "tip income" under HRS § 481B–14 with "earned compensation" under HRS § 388–6. They state:

In fact, a worker never "earns" the service fees that are above and beyond what he is contractually entitled to. Any part of the service fees that an employee might claim as the result (solely) of an employer's failure to make full disclosure was simply an unearned windfall.

11. Defendants explain that, because Gurrobat never worked at the Pagoda Hotel, "it is insufficient to rely on unidentified Pagoda Hotel employees who are purportedly similarly situated to obtain standing to assert claims with respect to Pagoda Hotel." They further elaborate:

For similar reasons, Gurrobat failed to establish that his claims are typical of the claims of the class members—especially those employed at Pagoda Hotel. Assuming *arguendo* that Gurrobat may have a cause of action against Pacific Beach Corporation, he still could not represent a class with claims concerning Pagoda Hotel, which never employed him.... Nor did Plaintiff proffer any evidence supporting any exception to Rule 23's typicality or adequate class representative requirements.... Moreover, the service charge distribution practices at the Pacific Beach Hotel and the Pagoda Hotel differed. Not only were the percentage breakdowns of the service charges different, the hotels' definition of "management employee" differed as well. Thus, the Circuit

Court should not have accepted Gurrobat's assertion that his claim was typical of those of the class members, since many of the class members were allegedly harmed by a different policy.

12. Defendants contend that Pacific Beach Corporation should not be held liable for any service charge income due to employees at the Pagoda Hotel because the alleged violations at each hotel involved separate groups of employees with different employers, Pacific Beach Corporation had no managerial responsibility over employees at the Pagoda Hotel, and Gurrobat failed to establish any nexus between the practices of the Pacific Beach Corporation and the harm alleged at the Pagoda Hotel.

13. Defendants admit that HTH Corporation and Pacific Beach Corporation collectively operate the Pacific Beach Hotel, and HTH Corporation operates the Pagoda Hotel. They contend, however, that there was no evidence that HTH Corporation qualified as an "employer" under HRS Chapter 388. Instead, they maintain that Pacific Beach Corporation is the employer of all individuals who work at the Pacific Beach Hotel, and Pagoda Hotel, Inc. is the employer of all individuals who work at the Pagoda Hotel.

14. Gurrobat asserts that the "tip income" referred to in HRS § 481B–14 was "earned" compensation because the statute obligated Defendants to pay such service charge income to members of the Plaintiff Class. He elaborates:

also argues that the court did not err in granting class certification because, by Defendants' own admissions, HTH Corporation "owned and operated" both the Pacific Beach Hotel and the Pagoda Hotel, Pacific Beach Corporation "operated" both Hotels, and Defendants were therefore "employers" of Gurrobat and other members of the Plaintiff Class. He argues that, even if he never worked at the Pagoda Hotel, this fact would not preclude him from representing the Plaintiff Class because he had individual standing to bring his own claims against both HTH Corporation and Pacific Beach Corporation, and the requirements of HRCP Rule 23 were met so long as there was a common defendant who injured all class members.[15]

In addition, Gurrobat contends that the court did not err in awarding damages because managerial employees were not entitled to service charge income under HRS § 481B–14, and Defendants could provide no equitable justification for its withholding of service charge income. Finally, he argues that Defendants' "joint and several" liability arose from their contractual obligations to pay wages and tip income to employees; however, even if Defendants' liability arose in tort, the practice of withholding service charge income in violation of HRS § 388–10 constituted an intentional tort for which joint and several liability could be imposed.

Defendants reply that Gurrobat's procedural arguments for dismissing their appeal lack merit because they did not waive any of the arguments they now raise. They contend that Gurrobat misstates the record by asserting that Pacific Beach Corporation operated the Pagoda Hotel,[16] there was no evidence of a nexus between Pacific Beach Corporation and the Pagoda Hotel, there was no basis for joint and several liability, and there was no connection between Gurrobat and the employment practices or policies at the Pagoda Hotel. In addition, they reiterate their argument that "service charges" under HRS § 481B–14 cannot be construed to constitute "earned" compensation for purposes of recovering unpaid wages under HRS § 388–6.

### 2. Gurrobat's Cross–Appeal Re: HRS Chapter 480

Gurrobat argues on cross-appeal that the circuit court erred in granting partial summary judgment in favor of Defendants on his UMOC claim. Specifically, he contends that the court misunderstood and misapplied the requirements of *Davis v. Four Seasons Hotel*

---

Because the Hotel Defendants made no disclosure to consumers about using a portion of the service charge for expenses other than payments to service employees, the law obligated them to pay all of the service charge to class members as "tip income." Hence, by the Hotel Defendants' *own* definition of "earned" (i.e., not "above and beyond" the amount to which the contract entitled an employee), the law obligated them to pay the Class members, and the tip income compelled by Section 481B–14 was therefore "earned" by laboring in a "disclosure-free" environment.

**15.** Gurrobat explains that his non-employment at the Pagoda Hotel would not affect his standing to bring suit against Defendants or his appropriateness as a class representative. Because he had worked at the Pacific Beach Hotel, which was operated by HTH Corporation and Pacific Beach Corporation, he had standing to bring his own claim against both Defendants.

He further states that, because the Pacific Beach Hotel and the Pagoda Hotel were both owned by HTH Corporation, and jointly operated by HTH Corporation and Pacific Beach Corporation, there was no meaningful distinction between the class segments at the two hotels. He elaborates:

The fact that some worked at one hotel and some worked at another is a difference without a distinction because both segments of the Class, the Pacific Beach Hotel workers and the Pagoda Hotel workers, worked for a common owner and had the same joint operators of their respective hotels. The only differences were thus location and perhaps dollar amounts. However, the Hotel Defendants have not shown that such differences between the two segments of the Class make Gurrobat inadequate or non-typical as a [HRCP] Rule 23 representative.

**16.** Defendants contend that Gurrobat relies on a settlement conference statement, in which Pacific Beach Corporation and HTH Corporation stated that they operated the Pagoda Hotel. They argue, however, that this statement did not constitute an admission by Defendants because it was not admissible under Hawai'i Rules of Evidence Rule 408 and it was a mistake that conflicted with Defendants' statements throughout the litigation. In support of this position, they point out that Defendants objected to Gurrobat's proposed Final Judgment on the ground that Pacific Beach Corporation did not own or operate the Pagoda Hotel and, therefore, should not be liable for the entire amount of the judgment.

*Ltd.*, 122 Hawai'i 423, 228 P.3d 303. Accordingly, he claims that he provided sufficient proof to allege an UMOC claim under HRS Chapter 480.

Gurrobat argues, inter alia, that Defendants failed to meet their burden of proof for summary judgment and that the record presented genuine issues of material fact as to whether he could establish the requisite injury for a claim under HRS § 480-13(a). Gurrobat asserts that he satisfied the "causation requirement" for an UMOC claim by showing that Defendants' conduct both negatively impacted "fair competition" and caused injury to members of the Plaintiff Class.[17] He explains that he identified Starwood Hotels as a law-compliant competitor that retains fifteen percent of the service charge income but discloses this practice to its customers; the fact that he could not identify any hotels that distribute all of the service charge income to its service employees does not preclude him from showing that Defendants' practices unfairly affected competition.[18] He maintains that requiring the injury to employees to flow from the effect on competition, rather than from the aspect of the conduct that affects competition, makes little sense.

In addition, Gurrobat asserts that the court erred in disregarding the testimony of his expert witnesses merely because they lacked knowledge of particular law-compliant hotels. Gurrobat argues that HRS Chapter 480 is the only statutory remedy that provides a right of action for injunctive relief, and the court's failure to recognize a claim under this section would deprive employees of adequate protection against violations of HRS § 481B-14.

In their Answering Brief, Defendants contend that pursuant to *Davis*, 122 Hawai'i 423, 228 P.3d 303, a claim brought under HRS § 480-13(a) requires Gurrobat to show that he suffered an "antitrust injury" (i.e., that he was injured as a result of Defendants' anti-competitive conduct).[19] They argue that Gurrobat presented no evidence that Defendants' service charge distribution practices had an anti-competitive effect, or that members of the Plaintiff Class suffered injury as a result of an anti-competitive aspect of Defendants' conduct.[20] Defendants also argue

---

17. Gurrobat argues that, while Clayton Act and Sherman Act cases require a resulting "antitrust injury," an unfair method of competition claim under HRS § 480-13(a) simply requires the plaintiff to show some type of injury to "fair competition." Accordingly, he contends:

> In short, Gurrobat is merely required to show how Pacific Beach's acts *unfairly* affect competition, not that Defendant's acts constitute a Clayton or Sherman Act violation and caused the type of price-increasing effect that those federal statutes aim to prevent. The reports of Mr. Tatibouet and Dr. Brewbaker plainly satisfy this requirement. They show that by their improper acts, Pacific Beach has gained a competitive advantage over any other law compliant, non-disclosing hotel or restaurant that remits the entire service charge to their food and beverage servers.... Thus, Gurrobat has shown that Pacific Beach's unfair acts have a negative effect on fair competition that was only made possible by Pacific Beach's violation of HRS § 481B-14 (i.e., retaining portions of the service charge without proper disclosure to customers) and by the injury to Gurrobat (loss of tip income) which flowed from this violation.

18. Gurrobat explains that the non-existence of a hotel that distributes one-hundred percent of its service charge income to its service employees, rather than disclosing its practice to customers,

does not preclude employees from asserting an UMOC claim. He elaborates:

> The issue here is the effect on *fair* competition, not the effect on other cheaters. The lower court apparently assumed that there must first be a law-compliant hotel in order for anyone to have a claim for unfair methods of competition. However, in a market where everyone is engaged in the same unfair method of competition, there will be no "victims" other than consumers and workers.

19. Defendants argue that Gurrobat's HRS § 480-13(a) claim was based on theoretical injury to hypothetical competitors, his allegation that the entire hotel industry engaged in the same service charge distribution practices indicated that there was no harm to competition, and his arguments for imposing liability under HRS § 480-13(a) were contrary to *Davis*, which rejected the position that a per se violation of HRS § 481B-14 was sufficient to allege an UMOC claim.

20. Defendants contend:

> At best, Gurrobat had two experts who opined in the abstract that, generally, hotels and banquet providers that do not disclose service charge distribution policies hold a "competitive advantage" over those who either make such a disclosure or pay the entirety of the

that, although Gurrobat could petition the Attorney General or the director of the Office of Consumer Protection to bring a claim for unfair or deceptive acts or practices under HRS § 480–2(d), he cannot assert an UMOC claim based on conduct that does not cause the kind of injury that HRS § 480–13(a) is intended to prevent.

In reply, Gurrobat repeats his argument that the causation requirement for an UMOC claim is satisfied as long as the plaintiff alleges and proves the "nature of the competition" (i.e., the causal connection between the UMOC and the alleged injury). He maintains, therefore, that HRS § 480–2 was intended to protect against the "unfair" nature of a defendant's conduct and its impact on "fair competition," rather than simply a reduction in competition.

### III. Standards of Review

#### A. Class Certification

■ "The question of whether a suit shall be allowed to proceed as a class action is one of fact, to be determined by the trial judge within his discretion." *Life of the Land v. Burns*, 59 Haw. 244, 252, 580 P.2d 405, 410 (1978) (citations omitted). "The party seeking class certification assumes the burden of establishing the four prerequisites for class certification delineated in [HRCP] Rule 23(a) as well as demonstrating the presence of a suitable situation for the maintenance of a class action under HRCP Rule 23(b)." *Kemp v. State of Hawai'i Child Support Enforcement Agency*, 111 Hawai'i 367, 385, 141 P.3d 1014, 1032 (2006) (citation and internal quotation marks omitted).

■ "As to the requirement of HRCP Rule 23(a)(3) that the claims of the representative be typical of the claims of the class as a whole, this court has equated typicality with the absence of conflict of interest." *Kemp*, 111 Hawai'i at 385, 141 P.3d at 1032 (citation and internal quotation marks omitted). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class mem-

bers." *Id.* (citations and internal quotation marks omitted).

#### B. Summary Judgment

■ A motion for summary judgment is reviewed de novo, under the same standard applied by the trial court. *State v. Tradewinds Elec. Serv. & Contracting*, 80 Hawai'i 218, 222, 908 P.2d 1204, 1208 (1995). *See* Hawai'i Rules of Civil Procedure ("HRCP") Rule 56. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Pac. Int'l Serv. Corp. v. Hurip*, 76 Hawai'i 209, 213, 873 P.2d 88, 92 (1994) (citation omitted). A fact is material if proof of that fact would have the effect of establishing or refuting an essential element of a cause of action asserted by one of the parties. *Guajardo v. AIG Hawai'i Ins. Co.*, 118 Hawai'i 196, 201, 187 P.3d 580, 585 (2008).

■ On a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party. *First Ins. Co. of Hawai'i v. Sariaslani*, 80 Hawai'i 491, 494, 911 P.2d 126, 129 (1996). The burden lies upon the moving party to show that no genuine issue of material fact exists with respect to the essential elements of the claim and that, based on the undisputed facts, he is entitled to judgment as a matter of law. *Id.* at 493, 911 P.2d at 128. Only once the moving party has satisfied its initial burden of production does the burden shift to the non-moving party to show specific facts that present a genuine issue for trial. *Id.*

### IV. Discussion

#### A. Class Certification under HRCP Rule 23

Defendants argue that the circuit court erred in granting class certification because Gurrobat never worked at the Pagoda Hotel, he lacked standing to assert claims regarding

---

service charges to the service employees. Neither expert offered any opinion as to how such

a competitive advantage harmed the plaintiffs in this case.

that hotel, and he failed to establish that he could adequately represent the Plaintiff Class under HRCP Rule 23. Gurrobat argues that even if he was never employed at the Pagoda Hotel, he had standing to bring his own claims against both HTH Corporation and Pacific Beach Corporation because (1) HTH Corporation was a common defendant who had injured all class members, (2) there was no meaningful difference between class segments at the two hotels, and (3) he could adequately represent class members under HRCP Rule 23.

A party seeking to file suit as a representative member of a class must establish his right to do so by establishing the four prerequisites for class certification and demonstrating the presence of a suitable situation for the maintenance of a class action. *Life of the Land v. Land Use Comm'n of State of Hawai'i*, 63 Haw. 166, 180–81, 623 P.2d 431, 443–44 (1981). Class certification is only appropriate where: (1) "the class is so numerous that joinder of all members is impracticable"; (2) "there are questions of law or fact common to the class"; (3) "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (4) "the representative parties will fairly and adequately protect the interests of the class." HRCP Rule 23(a).

The first of these prerequisites focuses on "who are the proposed class," and requires members of that class to be identifiable and their possible joinder impracticable. *Life of the Land*, 63 Haw. at 181, 623 P.2d at 444. The second prerequisite focuses on "what are the claims or defenses of the class," and requires the presence of common claims or defenses extending throughout the class. *Id.* at 182, 623 P.2d at 444. The third prerequisite focuses on "what is the individual claim (or defense) of the class representative," and requires that this claim or defense be coextensive with the claims or defenses of the

class. *Id.* at 182, 623 P.2d at 444. Finally, the fourth prerequisite focuses on "who is the representative," and requires that this individual be capable of fairly and adequately representing the entire class. *Id.*

■ As this court has explained, the third requirement (i.e., "typicality") was designed to be read in conjunction with the fourth requirement (i.e., "fair representation"). 63 Haw. at 183, 623 P.2d at 444–45. "Where claims or defenses are coextensive, there is a probability of fair and adequate representation; where they are potentially conflicting, absentees are unlikely to be afforded representation consistent with notions of fairness and justice." *Id.* at 183, 623 P.2d at 445 (citation omitted) (concluding that plaintiffs failed to sustain their burden for class certification by showing an absence of conflict between the interests of a particular defendant and members of the putative defendant class).

■ Here, the claims asserted by Gurrobat are coextensive with those asserted on behalf of the entire certified class (i.e., all non-managerial service employees whose tip income was unlawfully withheld by Defendants). The conduct giving rise to those claims was Defendants' practice of retaining a portion of service charge income in violation of HRS § 481B–14. Although phrased as an issue of standing, Defendants essentially challenge Gurrobat's ability to fairly and adequately represent class members who were employed at a different location, by only one of the two Defendants.[21] Even if Gurrobat never worked at the Pagoda Hotel, the legal and factual bases underlying his claims are coextensive with those of all other class members.[22] Further, employment at one but not another of the two hotels would not create a conflict of interest between Gurrobat and other class members. Under the facts of this case, Gurrobat established that

---

**21.** Gurrobat had standing to bring claims against both HTH Corporation and Pacific Beach Corporation because they operated the Pacific Beach Hotel, at which Gurrobat was employed. The issue raised by Defendants, however, is whether Gurrobat could adequately represent class members at the Pagoda Hotel, which was only operated by HTH Corporation.

**22.** To the extent that any differences may exist between the percentage of the service charge withheld or the entity responsible for managing each hotel, such differences might affect the amount individual class members are entitled to recover or the respective liability of each Defendant, but not Defendants' liability or the conduct giving rise to that liability.

he could fairly and adequately protect the interests of class members, and the circuit court did not err in certifying the proposed class.

## B. Gurrobat's Claim for Unpaid Wages

### 1. Liability under HRS Chapter 388

Defendants contend that Gurrobat was not entitled to summary judgment on his claim for unpaid wages because "tip income" distributed to employees pursuant to HRS § 481B–14 does not constitute "earned compensation" under HRS § 388–6. Gurrobat argues that, based on a plain reading of the statutes, "tip income" from a service charge imposed on customers is earned by service employees and is compensation due to them under law.

This court's recent decision in *Villon v. Marriott Hotel Services, Inc.* controls this issue. In *Villon,* we accepted a certified question from the United States District Court for the District of Hawai'i on whether service employees could bring a claim against a hotel employer under HRS §§ 388–6, –10, and –11, based on alleged violations of HRS § 481B–14. *Villon,* 130 Hawai'i at 132, 306 P.3d at 177. Answering this question in the affirmative, this court held:

> [W]hen a hotel or restaurant applying a service charge for the sale of food or beverage services allegedly violates HRS § 481B–14 (2008) (1) by not distributing the full service charge directly to its employees as "tip income" (in other words, as "wages and tips of employees"), and (2) by failing to disclose this practice to the purchaser of the services, the employees may bring an action under HRS §§ 388–6 (1993), –10 (1993 & Supp.1999), and –11 (1993 & Supp.1999) to enforce the employees' rights and seek remedies.

*Id.* at 132–33, 306 P.3d at 177–78.

This court agreed with the plaintiffs' contention that HRS § 481B plainly and unambiguously provides that "undisclosed and unpaid service charges are 'tips,' 'wages,' and 'compensation.'" *Id.* at 134, 306 P.3d at 179. We held that "when a hotel or restaurant distributes less than 100% of a service charge directly to its employees without disclosing

this fact to the purchaser, the portion withheld constitutes 'tip income,' synonymously phrased within HRS § 481B–14 as 'wages and tips of employees.'" 130 Hawai'i at 135, 306 P.3d at 180.

In addition, we concluded that the plain language of HRS Chapter 388 on withholding of wages supported the plaintiffs' contention that HRS § 481B–14 was enforceable through HRS Chapter 388. 130 Hawai'i at 135, 306 P.3d at 180. We further concluded that the provisions related to the withholding of wages in Chapter 388, sections 388–6, –10 and –11, applied to the enforcement of HRS § 481B–14. *Id.* We explained that HRS § 388–1 defines "wages" as "compensation for labor or services rendered by an employee." HRS § 388–1 also provides that "wages" include "tips or gratuities of any kind." *Id.* Therefore, we explained that service charges are "compensation earned" by the employee, because they are levied upon the consumer based upon "labor or services rendered by an employee," usually in lieu of a traditional tip. *Id.* at 135, 306 P.3d at 180. We further explained that HRS § 388–6, titled "Withholding of wages," prohibits an employer from retaining any part or portion of any compensation earned by the employee except where permitted by law. *Id.* Thus, we held, "for the purpose of enforcement under HRS § 388–6 ... 'wages' includes service charges as 'tips or gratuities of any kind,' because HRS § 481B–14 defines service charges as 'tip income' and 'wages and tips of employees.'" *Id.*

█ Accordingly, we held, "the plain language of HRS § 481B–14 and Chapter 388 indicates that a service charge is 'compensation earned' as 'tip income' or 'wages and tips of employees.' Therefore, an alleged violation of HRS § 481B–14 is enforceable through Chapter 388." 130 Hawai'i at 136–37, 306 P.3d at 181–82.

█ It is undisputed in this case that Defendants imposed a service charge at banquets and other functions held at the Pacific Beach Hotel and the Pagoda Hotel, and retained a portion of the service charge income without disclosing that practice to customers. Based on our decision in *Villon,* the circuit

court correctly held that "tip income" retained by Defendants in violation of HRS § 481B–14 constitutes "compensation" earned by service employees for purposes of bringing a claim under HRS §§ 388–6, 388–10, and 388–11.

## 2. Summary Judgment on the Issue of Damages

Next, Defendants argue that the court erred in failing to take into account the portion of service charge income that Defendants distributed to managerial employees when it awarded damages in favor of Gurrobat and other non-managerial service members, and there was a question of fact as to whether Defendants were equitably justified in failing to comply with HRS § 481B–14. Gurrobat, on the other hand, contends that tip income distributed pursuant to HRS § 481B–14 is not intended to supplement the income of managerial employees, and Defendants' claimed misunderstanding of law did not qualify as equitable justification for their unlawful withholding of tip income.

As we explained in *Villon*, the legislature's findings in enacting HRS § 481B–14 evinced a twofold concern: "first, that patrons may not know that service charges may be 'used to pay for costs or expenses other than wages and tips of employees'; and second, that employees 'may not be receiving tips or gratuities' from these service charges." 130 Hawai'i at 137, 306 P.3d at 182 (citing 2000 Haw. Sess. Laws Act 16, at 21–22). This dual focus reflects the legislative evolution of the bill that eventually gave rise to HRS § 481B–14. 130 Hawai'i at 137, 306 P.3d at 182.

When it was first introduced, the bill sought only to "protect employees who receive or may receive tips or gratuities during the course of their employment from having these amounts withheld or credited to their employers." *Id.* (citing H.B. 2123, 20th Leg., Reg. Sess. (2000)). As the bill evolved, it focused on the problem of uninformed consumers, who may not leave additional tips for the service employees, mistakenly thinking that the service charge they paid were tips. 130 Hawai'i at 138, 306 P.3d at 183 (citing H.

Stand. Comm. Rep. 479–00, in 2000 House Journal, at 1155).

We explained however, that toward the end of the bill's path to passage, the legislature recognized that "moneys collected as service charges are not always distributed to the employees as gratuities and are sometimes used to pay the employer's administrative costs." 130 Hawai'i at 139, 306 P.3d at 184 (citing S. Stand. Comm. Rep. No. 3077, in 2000 Senate Journal, at 1286–87). The legislature noted that the employee, therefore, "does not receive the money intended as a gratuity by the customer, and the customer is misled into believing that the employee has been rewarded for providing good service." *Id.*

Accordingly, we reasoned that throughout the bill's journey through the legislature, the concern for employees was never abandoned, stating: "We have previously recognized that 'the legislative history of H.B. 2123 indicates that the legislature was concerned that when a hotel or restaurant withholds a service charge without disclosing to consumers that it is doing so, both employees and consumers can be negatively impacted.'" 130 Hawai'i at 139–40, 306 P.3d at 184–83 (citing *Davis*, 122 Hawai'i at 434, 228 P.3d at 314 (emphasis added)).

 Based on the legislative history of HRS § 481B–14 and our analysis of the history in *Villon*, Defendants were not entitled to retain a portion of service charges to supplement the income of managerial employees, who are not otherwise entitled to tip income. Such a practice is analogous to using the service charge to pay the employer's administrative costs. Defendants were required to distribute one-hundred percent of service charge income to non-management service employees who provided the services for which customers believed they were tipping.

Defendants' only argument in defense of these practices was that they had acted in a manner consistent with a broader industry-wide trend among Hawai'i hotels. The fact that other hotels unlawfully retained service charges does not provide equitable justification for Defendants' violations of HRS § 481B–14. *Cf. Arimizu v. Fin. Sec. Ins.*

*Co., Inc.*, 5 Haw.App. 106, 112, 679 P.2d 627, 632 (1984) (rejecting defendant's argument that it had a "good faith" belief for withholding employee's wages based on a setoff claim, and holding that there was no genuine issue of material fact regarding the existence of an equitable justification).

As explained *supra*, the plain language of HRS § 481B–14 required Defendants to either distribute one-hundred percent of the service charge to employees as "tip income" or disclose their retention of a portion of the service charge to customers. Here, Defendants failed to comply with either of these provisions or to provide equitable justification for its violation of the statute. For this reason, class members were entitled to an award of double damages under HRS § 388–10.

## C. Imposition of Joint and Several Liability

Defendants argue that the court erred in imposing joint and several liability where the Pacific Beach Hotel and the Pagoda Hotel involved separate employers and employee populations, and thus, there was no basis for holding Pacific Beach Corporation liable for injuries suffered at the Pagoda Hotel. Gurrobat, on the other hand, argues that joint and several liability arose from Defendants' contractual obligations to pay wages and tip income to employees, but would also be available if Defendants' practice of withholding service charge income constituted an intentional tort in violation of HRS §§ 388–10 or 388–11.

■ Regarding contractual agreements, "joint and several liability" is defined as "liability of copromisors of the same performance when each of them, individually, has the duty of fully performing the obligation[.]" *Black's Law Dictionary* 837 (6th ed. 1990). *Cf.* HRS § 483–1 (defining "several obligors" as "obligors severally bound for the same performance"). Imposition of joint and several liability turns on whether the parties have promised the same performance to a

third party. *Lee v. Yano*, 93 Hawai'i 142, 147, 997 P.2d 68, 73 (App.2000) (explaining that a guarantor is not a co-obligor or joint and/or several obligor with the principal debtor).

■ In the context of tortious conduct, joint and several liability may be imposed, inter alia, "for the recovery of economic and noneconomic damages against joint tortfeasors in actions involving: [ ] Intentional Torts[.]" HRS § 663–10.9(2)(A). "Joint tortfeasors," in turn, are defined as "two or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been recovered against all or some of them." HRS § 663–11. In this regard, a plaintiff can only recover jointly and/or severally against two or more defendants if he can recover against each defendant. *Ozaki v. Ass'n of Apartment Owners of Discovery Bay*, 87 Hawai'i 265, 270–71, 954 P.2d 644, 649–50 (1998) (explaining that a tortfeasor cannot be jointly and/or severally liable with another unless the person harmed can sue and recover against both). *See Doe Parents No. 1 v. Dep't of Educ.*, 100 Hawai'i 34, 96, 58 P.3d 545, 607 (2002) (Acoba, J., concurring) ("Under joint and several liability, each defendant is completely and fully liable towards the injured person for the full amount of damages." (citation and internal quotation marks omitted)).

■ In determining whether HTH Corporation and Pacific Beach Corporation may be held jointly and severally liable for damages to the Plaintiff Class, we must consider the basis for holding each defendant liable. While Defendants' liability arose from the same conduct (i.e., their practice of retaining service charge income from non-managerial service employees), the claims against HTH Corporation stemmed from its operation of both the Pacific Beach Hotel and the Pagoda Hotel, whereas the claims against Pacific Beach Corporation stemmed from its operation of only the Pacific Beach Hotel.[23] In

**23.** Gurrobat cites a September 20, 2010 settlement conference statement in support of his contention that HTH Corporation and Pacific Beach Corporation together operate the Pagoda Hotel.

As Defendants argue on appeal, however, this appears to be a mistake because it was inconsistent with Defendants' prior statements that Pacif-

this regard, HTH Corporation can be held liable for injuries to employees at both hotels; however, there is no basis for holding Pacific Beach Corporation liable for injuries to employees at the Pagoda Hotel.[24]

Therefore, the circuit court erred in failing to apportion damages when it held Pacific Beach Corporation jointly and severally liable for wages unlawfully withheld at the Pagoda Hotel. We remand the case for a determination of the respective liability of each Defendant.[25]

### D. HTH Corporation's Status as an "Employer"

Defendants argue that the court's judgment was premised on a manifest error of fact because Gurrobat failed to prove that HTH Corporation was an "employer" of any member of the Plaintiff Class. Specifically, they contend that Pacific Beach Corporation is responsible for hiring employees at the Pacific Beach Hotel and is listed in the W–2 forms for that hotel, while Pagoda Hotel, Inc. is responsible for hiring employees at the Pagoda Hotel and is listed in the W–2 forms for that hotel. Gurrobat, however, argues that Defendants were "employers" of class members where, by their own admissions, HTH Corporation "owned and operated" the Pacific Beach Hotel and the Pagoda Hotel, and Pacific Beach Corporation "operated" both Hotels.

Under HRS Chapter 388, the term "employer" is defined to include "any individual, partnership, association, joint-stock company, trust, corporation, the personal representative of the estate of a deceased individual or the receiver, trustee, or successor of any of the same, employing any person, but shall not include the State or any political subdivision thereof or the United States." HRS § 388–1. The term "employ," in turn, is defined to mean "permit or suffer to work." *Id.*

The federal district court's decision in *Davis v. Four Seasons Hotel Ltd.* is instructive. In *Davis*, plaintiff employees brought a claim for unpaid wages against the entity responsible for managing the resorts at which plaintiffs worked, Four Seasons Hotel Ltd. ("Four Seasons"), and also, the entity that had an ownership interest in the two resorts, MSD Capital, Inc. 810 F.Supp.2d 1145, 1149 (D.Hawai'i 2011). Four Seasons disputed, among other things, that it was plaintiffs' "employer" because separate entities controlled the payroll of the subject hotels, issued financial statements, and made human resources decisions. *Id.* at 1158.

The District Court for the District of Hawai'i held that Four Seasons was contractually responsible for managing the resorts at which plaintiffs worked and had the authority to do so because it "permit[ted] or suffer[ed]" plaintiffs to work and was their "employer" under HRS § 388–1. 810 F.Supp.2d at 1158. In particular, the court noted that Four Seasons had power and responsibility to control plaintiffs in their capacity as banquet servers, had retained a portion of service charges, and was plaintiffs' employer "as a matter of economic reality." *Id.* at 1158–59 ("The overarching concern is whether the alleged employer possessed the power to control the worker in question." (Citation and internal quotation marks omitted)).

In this case, Defendants admit that HTH Corporation "operated" both the Pagoda Hotel and the Pacific Beach Hotel, and Pacific Beach Hotel "operated" the Pacific Beach Hotel, but they do not elaborate on what this means. Instead, they assert that HTH Corporation was not an "employer" of class members because other entities were

---

ic Beach Corporation operated the Pacific Beach Hotel but not the Pagoda Hotel.

**24.** We reach this conclusion regardless of whether liability is based on Defendants' contractual obligation to pay employees, or any tortious conduct in intentionally withholding wages in violation of HRS Chapter 388.

**25.** Exhibit 9 to Gurrobat's motion for summary judgment as to damages summarized managers'

share of service charge income at each of the hotels per year, and calculated a total of $1,678,783 based on an award of double damages with 6% interest compounded annually. In order to determine Pacific Beach Corporation's joint and several liability as to wages withheld at the Pacific Beach Hotel, the court would need to subtract that portion of damages arising from conduct at the Pagoda Hotel.

responsible for hiring employees at each of the hotels. As the federal district court recognized in *Davis*, an employee may have more than one "employer." Specifically, separate entities may control payroll, issue financial statements, make human resources decisions, etc. In addition, an entity's authority to manage the environment in which an employee works or to effectuate policies that affect an employee can constitute grounds for finding that it was an "employer" as a matter of economic reality. *Cf. Davis*, 810 F.Supp.2d at 1158–59.

By their own admissions, Defendants had authority over the operation of the hotels at which Gurrobat and the Plaintiff Class members were employed. Moreover, Defendants failed to raise an argument regarding their status as "employers" until after the court had entered its final judgment. Under these facts, the circuit court did not err in concluding that HTH Corporation was an "employer" under HRS Chapter 388.

### E. Judicial and Equitable Estoppel

Finally, Defendants argue that the court abused its discretion in finding they were judicially and equitably estopped from raising new arguments regarding joint and several liability, and that the arguments in their motion for reconsideration were waived as untimely. Gurrobat argues that Defendants failed to raise all but one of their alleged points of error before the circuit court made the relevant ruling, and those arguments must therefore be reviewed under an abuse-of-discretion standard.

 The doctrine of equitable estoppel, and specifically judicial estoppel, precludes a party from assuming inconsistent positions in the course of the same proceedings. *Cf. Rosa v. CWJ Contractors, Ltd.*, 4 Haw.App. 210, 218–20, 664 P.2d 745, 751–52 (1983) (holding that plaintiffs, who defeated defendant's motion to dismiss by arguing that defendant was a separate entity from an alleged co-obligor against which plaintiffs obtained a prior judgment, were estopped from taking an inconsistent position on summary judgment and arguing that defendant was a wholly-owned subsidiary of alleged co-obligor and was privy to co-obligor). The court held:

This doctrine is not strictly one of estoppel but partakes rather of positive rules of procedure based on manifest justice and, to a greater or less [sic] degree, on considerations of the orderliness, regularity, and expedition of litigation. At stake is the integrity of the judicial process. A party is stopped from playing "fast and loose" with the court or blowing "hot and cold" during the course of litigation.

*Rosa*, 4 Haw.App. at 218–19, 664 P.2d at 751 (citations and internal quotation marks omitted).

 In this case, the circuit court estopped Defendants from arguing against joint and several liability after they had "acted as one" throughout the course of the case. The court noted, in particular, "Defendants chose to be jointly represented by the same legal counsel, filed all of their motions and oppositions together, and even shared the same representative during settlement conferences. Only after summary judgment was granted did Defendants first make an argument based on their separate and distinct identities."

As Defendants point out, however, the issue of Defendants' separate identities did not become relevant until the court issued its judgment holding HTH Corporation and Pacific Beach Corporation jointly and severally liable for damages. The Defendants have maintained throughout the case that they are separate and distinct entities; HTH Corporation operates the Pagoda Hotel and the Pacific Beach Hotel, while Pacific Beach Corporation operates only the Pacific Beach Hotel. Without more, Defendants' joint representation by the same counsel and filing of motions together are not grounds for invoking judicial and/or equitable estoppel in this case. Accordingly, the circuit court abused its discretion in concluding that Defendants were estopped from contesting joint and several liability.

### F. The Unfair Methods of Competition Claim

#### 1. The Circuit Court's Ruling

The circuit court granted summary judgment on Gurrobat's UMOC claim based on

an alleged lack of requisite evidence to prove the "anticompetitive injury" aspect of his case. The circuit court concluded that although two experts who had opined that law-compliant hotels would be at a competitive disadvantage, the two experts had to have at least a foundation in fact or evidence of one or the other of the following to overcome Defendants' motion for summary judgment: (1) another hotel that either did not require service charges or required service charges and then distributed one-hundred percent of them to its service employees or (2) disclosed the withholding to its customers. The circuit court found that the "two experts had no knowledge of an existent market at all or the existence of any hotel that could provide either one of those two," and granted Defendants' motion for summary judgment.

We conclude that there is no requirement that plaintiffs asserting a claim based on HRS § 481B–14 prove the existence of law-compliant competitors who (1) distributed one hundred percent of service charge income to service employees or (2) disclosed to customers the practice of withholding a portion of service charge income.

### 2. *Davis* and the "Nature of the Competition"

Gurrobat argues that the circuit court erred in its interpretation of *Davis*, 122 Hawai'i 423, 228 P.3d 303. In *Davis*, this court answered a question certified by the United States District Court for the District of Hawai'i relating to whether banquet server employees had standing to bring a claim against hotel employers under HRS § 480–2(e), for violating HRS § 481B–14 by retaining a portion of service charge income without disclosing to customers that they were doing so. 122 Hawai'i at 424–25, 228 P.3d at 304–305. As part of the certified question, we addressed whether in order to have standing to bring an UMOC claim, employees must plead the existence of competition or an effect thereon, and also addressed the causation of injury requirements of an UMOC claim.

*Davis* explained that in order to state a cause of action and recover money damages under HRS § 480–2(e), a plaintiff must first satisfy the requirements of HRS § 480–13.

*Davis*, 122 Hawai'i at 434, 228 P.3d at 314 (citation omitted). "HRS § 480–13(a) provides that, with limited exceptions, any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by [chapter 480]:(1) [m]ay sue for damages ...; and (2) [m]ay bring proceedings to enjoin the unlawful practices[.]" *Id. Davis* noted, therefore, that a claim under HRS § 480–13 has three elements essential to recovery: (1) a violation of HRS chapter 480; (2) which causes an injury to the plaintiff's business or property; and (3) proof of the amount of damages. *Davis*, 122 Hawai'i at 435, 228 P.3d at 315 (citations omitted). In the instant case, the first and third elements are not at issue.

With respect to the second element, *Davis* explained that this element includes two parts. First, a plaintiff is required to allege an injury in fact to his or her "business or property." Like the plaintiffs in *Davis*, Gurrobat met the first requirement, injury in fact to his or her 'business or property,' by alleging and later offering evidence that he did not receive his entire share of service charges due to him.

Second, a plaintiff is required to allege the "nature of the competition." We explained that a plaintiff must allege the nature of the competition because, pursuant to HRS § 481B–4, a violation of HRS § 481B–14 "shall be deemed" both an UMOC and an unfair or deceptive act or practice in the conduct of any trade or commerce ("UDAP"). *Davis*, 122 Hawai'i at 439, 228 P.3d at 319. An employee, however, cannot pursue a claim for an UDAP under HRS § 480–2(d); thus, in order to maintain the distinction between claims of UMOC and UDAP, we held that a plaintiff was required to allege the "nature of the competition." *Davis*, 122 Hawai'i at 437, 228 P.3d at 317. We explained that this means that the plaintiff must allege that "he or she was harmed as a result of actions of the defendant that negatively affect competition." *Davis*, 122 Hawai'i at 438, 228 P.3d at 318. The plaintiff was further required to allege "how [Defendants] conduct [would] negatively affect competition." *Davis*, 122 Hawai'i at 437–38, 228 P.3d at 317–18.

### a. How Defendants' Conduct Negatively Affects Competition

We held in *Davis* that "although Employees allege that they have suffered an injury resulting from Four Seasons' violation of § 481B–14, which is deemed to be an unfair method of competition by § 481B–4, Employees are additionally required to allege the 'nature of the competition,'" specifically how the Four Seasons' conduct will negatively affect competition. *Davis*, 122 Hawai'i at 443, 228 P.3d at 323. We concluded that the employees in *Davis* had made no such allegation, and therefore had not satisfied the requirements to pursue a claim under HRS § 480–2(e). *Id.* at 437–38, 228 P.3d at 317–18.

Unlike the plaintiffs in *Davis*, Gurrobat alleged in his second amended complaint and offered evidence on summary judgment that Defendants' practice of withholding a portion of the service charge without disclosure to customers allowed them to charge lower base prices than law-compliant competitors, thereby reducing "fair competition" in the market for hotels, restaurants, and banquet service providers. Moreover, Gurrobat produced declarations from two experts, long-time isle hotelier Andre Tatibouet, and Bank of Hawaii's now-retired chief economist Paul Brewbaker, who opined that any hotel that complies with the law by distributing the entire service charge has higher labor costs and pricing structure and is therefore, at a competitive disadvantage than a hotel that does not comply. Gurrobat plainly satisfied the test set forth in *Davis*.

■ The dissent argues that we relied on the reports of Tatibouet and Brewbaker in concluding that Gurrobat demonstrated harm to "fair competition." Dissenting Opinion at ——, 323 P.3d at 823. However, proof of how a defendant's conduct negatively affected competition does not necessarily require expert testimony, proof that a defendant lowered their prices, or that a defendant's conduct injured other hotels. A plaintiff is only required to prove that a defendant's conduct is harmful to fair competition.

■ Additionally, we note that similar to *HMA*, plaintiffs may prove how a defendant's conduct negatively affects competition by showing that defendant's conduct enables the defendant to create incentives for customers to purchase banquet services from the defendant instead of competitors who did not engage in the unlawful conduct. In *Davis*, we noted that we specifically stated in *HMA*:

> [I]f HMSA engages in acts or practices that impede or interfere with physicians' ability to provide effective healthcare services to their patients and/or create incentives for patients to look elsewhere for medical services—that is, to other participating physicians who may be reluctant to challenge HMSA or to non-participating physicians—such acts or practices can, if proven, constitute unfair methods of competition[.]

*Davis*, 122 Hawai'i at 436, 228 P.3d at 316 (citing *HMA*, 113 Hawai'i at 112–13, 148 P.3d at 1214–15) (emphasis added).

■ Thus, as stated *supra*, Gurrobat provided sufficient evidence of how Defendants' conduct negatively affected competition, i.e., harmed fair competition, because Defendants' unlawful conduct allows Defendants to lower their overall costs through retaining the tip income, attract customers by being able to offer seemingly lower base prices, and mislead customers into believing that the service charge will be paid as tip income. Defendants' unlawful conduct, therefore, enables Defendants to obtain the business of customers through an unfair and illegal business advantage over law-compliant hotels, restaurants and banquet service providers. Therefore, Gurrobat sufficiently proved that Defendants' conduct negatively affects fair competition.

### b. Injury as a result of conduct that negatively affects competition

Defendants argue that they were entitled to summary judgment because Gurrobat failed to present evidence of the anticompetitive effects of Defendants' alleged conduct or that his injury resulted from alleged anticompetitive conduct.

■ As discussed *supra*, a sufficient "nature of the competition" allegation requires a plaintiff to allege how the defendants' con-

duct negatively affects competition. In addition, pursuant to HRS § 480–13, a plaintiff is required to allege that he or she was harmed as a result of the defendant's violation of HRS § 481B–14. A plaintiff need not allege and prove, however, that his or her injury was a result of the anti-competitive <u>effect</u> of the violation. Such a requirement would limit causes of action under HRS § 480–13(a) to consumers and competitors of a defendant, and would thus, contravene this court's holdings in *HMA* and *Davis* that the plaintiff need not be a consumer, a competitor of, or in competition with the defendant in order to have standing under HRS § 480–13(a). *See HMA,* 113 Hawai'i at 110, 148 P.3d at 1212 ("[P]laintiffs need not be competitors of, or in competition, with the defendants to sustain their claims of unfair methods of competition"); *Davis,* 122 Hawai'i at 429, 228 P.3d at 309 (concluding that HRS § 480–13(a) states "any person" may bring suit for an injury, and therefore, standing is not limited to consumers, businesses, or competitors, and can in fact extend to employees).

Accordingly, *Davis* does not stand for the proposition that in order to recover for an UMOC claim for a violation of HRS § 481B–14, the plaintiff must prove that his or her injury resulted from the negative effect on competition. Although a plaintiff must allege and ultimately prove how a defendant's conduct negatively affected competition, the plaintiff need not prove that his or her injury resulted from that negative effect on competition. On the contrary, a plaintiff need only prove an injury that flows from that which makes defendants' acts unlawful. *Davis,* 122 Hawai'i at 439, 228 P.3d at 319 (citing *Robert's Hawai'i,* 91 Hawai'i 224, 254 n. 31, 982 P.2d 853, 883 n. 31). Gurrobat satisfied this requirement by alleging and offering evidence of how (1) Defendants' conduct negatively affected competition, and (2) such unlawful conduct injured plaintiffs in their business or property by depriving service employees of tip income to which they were entitled.[26]

Thus, pursuant to *Davis,* a plaintiff may recover under HRS §§ 480–2 and 480–13 for violations of HRS § 481B–14, if the plaintiff alleges and proves: (1) a violation of HRS Chapter 480; (2) an injury to the plaintiff's business or property that flows from the defendant's conduct that negatively affects competition or harms fair competition; and (3) proof of damages.

Elements (1) and (3) are not at issue in this case. Gurrobat also presented sufficient evidence on element (2). Therefore, we hold the circuit court erred in granting Defendants' motion for summary judgment.

### III. CONCLUSION

We hold the following on Gurrobat's claims for unpaid wages under HRS § 388–6: the circuit court correctly concluded that (1) Gurrobat established that he could fairly and adequately protect the interests of the Plaintiff Class, (2) Gurrobat was entitled to judgment as a matter of law on Gurrobat's HRS § 388–6 claim, (3) Gurrobat was entitled to double damages and interest as a matter of law under HRS § 388–10, and (4) HTH Corporation was an "employer" pursuant to HRS § 388–1. However, we hold that the circuit court erred in imposing joint and several liability on Defendants.

Therefore, we (1) affirm the circuit court's order granting Gurrobat's motion for class certification, (2) affirm the circuit court's order granting Gurrobat's motion for partial summary judgment as to the claims for unpaid wages under HRS Chapter 388; and (3) affirm in part Gurrobat's motion for summary judgment as to damages for his HRS Chapter 388 claim. However, we vacate the portion of the circuit court's order granting Gurrobat's motion for summary judgment as to damages under HRS Chapter 388 that imposed joint and several liability on the Defendants, and remand for further proceedings to properly apportion the damages between Defendants.

As to Gurrobat's UMOC claim, we hold that the circuit court erred in granting De-

---

**26.** Gurrobat asserted: "These unfair competitive advantages were gained by Defendants at the direct expense of Plaintiff and other members of the Class, and Plaintiff and the Class members were injured as a result of Defendants' unfair method of competition and the Defendants' unfair competitive behavior in the hotel food and beverage market."

fendants' motion for summary judgment because Gurrobat (1) satisfied the "nature of the competition" requirements under *Davis*, and (2) presented sufficient evidence, there being no issues with respect to the first and third elements, to satisfy the second element required for recovery under HRS §§ 480–2 and 480–13 for violations of HRS § 481B–14. Therefore, we vacate the circuit court's order granting Defendants' motion for summary judgment on Gurrobat's unfair competition claim, and remand the claim to the circuit court for further proceedings consistent with this opinion.

RECKTENWALD, C.J., NAKAYAMA, and McKENNA, JJ., with ACOBA, J., Concurring and Dissenting, with whom POLLACK, J., joins.

Concurring and Dissenting Opinion by ACOBA, J., in which POLLACK, J., joins.

It must be reaffirmed that because a violation of Hawai'i Revised Statutes (HRS) § 481B–14 (Supp.2000),[1] which requires that a hotel or restaurant service charge be distributed to employees as tip income or that the contrary be disclosed to consumers, is

1. HRS § 481B–14 provides as follows:

> **§ 481B–14 Hotel or restaurant service charge; disposition**
> Any hotel or restaurant that applies a service charge for the sale of food or beverage services <u>shall distribute the service charge directly to its employees as tip income or clearly disclose to the purchaser of the services that the service charge is being used to pay for costs or expenses other than wages and tips of employees.</u>
> (Emphasis added).

2. HRS § 481B–4 provides as follows:

> **§ 481B–4 Remedies**
> Any person who violates this chapter <u>shall be deemed to have engaged in an unfair method of competition and unfair or deceptive act or practice</u> in the conduct of any trade or commerce <u>within the meaning of section 480–2.</u>
> (Emphases added).

3. HRS § 480–2 provides in relevant part as follows:

> **§ 480–2 Unfair competition, practices, declared unlawful**
> (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful.
> . . .

"deemed" to be an unfair method of competition (also UMOC herein) under HRS § 481B–4 (Supp.2008),[2] and thus "unlawful" under HRS § 480–2 (Supp.2002),[3] employees as injured "persons" and consumers may sue for damages pursuant to HRS § 480–13 (Supp.2005),[4] without alleging any anti-competitive effect of the violation. *Villon v. Marriott Hotel Services, Inc.*, 130 Hawai'i 130, 306 P.3d 175 (2013) (Acoba, J., concurring and dissenting, joined by Chan, J.) (citing *Davis v. Four Seasons Hotel, Ltd.*, 122 Hawai'i 423, 447–49, 228 P.3d 303, 327–39 (2010)) (Acoba, J., dissenting). On that basis, I would vacate the grant of summary judgment by the Circuit Court of the First Circuit (the court) in favor of Defendants–Appellants/Cross–Appellees HTH Corporation and Pacific Beach Corporation (collectively, Defendants).[5]

However, the majority concludes that, in addition to establishing a violation of HRS § 481B–14, Plaintiff–Appellee/Cross–Appellant Raymond Gurrobat (Gurrobat) is required to prove an "anticompetitive injury;" such injury is proven through expert testimony establishing harm to "fair competition;"

> (d) No person other than a consumer, the attorney general, or the director of the office of consumer protection may bring an action based upon unfair or deceptive acts or practices declared unlawful by this section
> (e) <u>Any person may bring an action based on unfair methods of competition declared unlawful by this section.</u>
> (Emphasis added.)

4. HRS § 480–13 provides in relevant part as follows:

> **§ 480–13 Suits by persons injured; amount of recovery; injunctions**
> (a) Except as provided in subsections (b) and (c), <u>any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by this chapter:</u>
> (1) May sue for damages sustained by the person and, if the judgment is for the plaintiff, <u>the plaintiff shall be awarded a sum not less than $1,000 or threefold damages by the plaintiff sustained</u>, whichever sum is the greater . . . .
> (Emphases added.)

5. I agree with the majority that the court did not err in certifying this as a class action, that Gurrobat was entitled to double damages under HRS § 388–10, that the court erred in holding Pacific Beach Corporation jointly and severally liable, and that HTH Corporation was correctly classified as an employer.

on remand, Gurrobat must prove an anticompetitive injury; and inferentially these requirements apply in future cases. I cannot agree with these propositions. In my view, once a violation is established under HRS § 481B–14, employees denied tip income should not be required to submit additional proof in this case or in any future case to recover.

## I.

### A.

This case involves the alleged failure of Defendants to inform their customers that a portion of the "service charge" imposed at "banquet[s] or other functions" was not distributed to "the non-managerial employees who provided the service of [ ] food and beverage[s] to the customers," thereby violating HRS § 481B–14. In his Complaint, Gurrobat alleged that this practice allowed Defendants to attract customers from "law-abiding competitors" by "offer[ing] customers seemingly lower 'base' prices than law-compliant competitors through the retention of tip income." Gurrobat further asserted that by virtue of Defendants' violations they were "engaged in [a UMOC] in violation of HRS § 480–2 inasmuch as violations of any provision of Chapter 481B are deemed to be unfair methods of competition prohibited by HRS § 480–2."

### B.

#### 1.

On October 4, 2010, Defendants filed a motion for summary judgment, acknowledging that they had "distribut[ed] a portion of [the] service charges to their managerial employees," [6] but contending, *inter alia*, that they were entitled to summary judgment on

Gurrobat's claim for treble damages under HRS §§ 480–2 and 480–13 because Gurrobat "d[id] not have any evidence to prove that the service charge distribution practices of [ ] Defendants had a negative effect on competition as required by the Hawai'i Supreme Court's recent decision in *Davis.*"

#### 2.

In opposition, Gurrobat filed reports of two experts, Andre Tatibouet (Tatibouet) and Paul Brewbaker (Brewbaker). Brewbaker's report explained that, theoretically, a [hotel] that violates HRS § 481B–14 "can both underpay workers and enjoy higher net receipts than other [hotels.]" However, it is unclear from Brewbaker's report whether such hotels would be able to set lower prices as a result of their competitive advantage. On one hand, Brewbaker's report stated that, under certain theoretical assumptions, "no single hotel can exert an influence on market prices or wages." On the other hand, based on the same assumptions, Brewbaker stated that "market prices and wages [will] adjust to reflect the single [hotel's violation of HRS § 481B–14]."

But, Brewbaker allowed that a non-compliant hotel's advantage would diminish over time because "[w]orkers at the [non-compliant hotel] have the mobility to migrate to other [hotels] where they observe that higher effective wages are being paid." Thus, "[t]his, in turn, will increase the supply of labor to those [hotels], and reduce the supply of labor to the [non-law compliant hotel]." Consequently, "[t]he [non-law compliant hotel] will have to pay more to retain its workers, while other [hotels] may in the transition enjoy a temporary reduction in effective wage cost." (Emphasis added.) "*At least temporarily,* therefore, during the adjustment to a new equilibrium,[7] the economic

---

6. I also agree with the majority that Defendants were not entitled to retain a portion of service charges to supplement the income of managerial employees. Instead, Defendants were "required to distribute one hundred percent of the service charge income to non-management service employees[.]" Majority opinion at ——, 323 P.3d at 808. Thus, the distribution of the service charge to managerial employees, without informing consumers, violated HRS § 481B–14. *See id.*

7. Brewbaker stated that "[u]ltimately, effective wages have to equilibrate—all [hotels] paying the same effective wage[.]" Brewbaker also related that this process of equilibration would involve the non-compliant firms "taking from everybody else who is compliant ... a small amount that adds up to the cheater's economic rent."

It is therefore unclear from Brewbaker's report whether the benefits to the non-compliant firm would remain once a new equilibrium is reached. However, inasmuch as Brewbaker

rents comprising above average return to equity will be enjoyed by the [non-compliant hotel] as reward for violating [HRS § 481B–14]." [8] (Emphasis added.) Brewbaker characterized this as a "competitive advantage."

Tatibouet's report stated that based on his experience of over 50 years working in the Hawai'i hotel industry, it was his opinion that "Hawai'i consumers of banquet services are price sensitive," and "when the net price charged by the hotel ... is equal or close, the Hawai'i consumer will typically prefer the hotel or banquet provider that includes a service charge over one that does not[.]" Accordingly, "[h]otels that retain part of the service charge and do not disclose it have a better cost and revenue structure than hotels that pay the amount to the employees ... because they are keeping more of the revenue." As a result, "when hotels and banquet providers do not disclose service charge retention, they hold a competitive advantage over those that do disclose this information or those that pay the entirety of the service charge to [their] employees." Tatibouet's report concludes that "this advantage will translate directly into increased revenues and profits for [hotels that violate HRS § 481B–14] and decreased revenues and profits for [hotels that obey HRS § 481B–14]." [9]

In his accompanying memorandum in opposition, Gurrobat argued that to meet the requirements of *Davis,* he was only required to demonstrate that the Defendants "reduced *fair* competition" by "unfairly creating an incentive for customers to bring their business to Defendants[.]" (Emphasis in original.) (Citing *Hawai'i Med. Ass'n v. Hawai'i Med. Serv. Ass'n, Inc., (HMA )* 113 Hawai'i 77, 113, 148 P.3d 1179, 1215 (2006).) Gurrobat characterized the expert reports as demonstrating that "any hotel that complies with

the law by distributing the entire service charge has higher labor costs and [a higher] pricing structure than Defendants and is therefore at a competitive disadvantage to Defendants[.]" Thus, according to Gurrobat, "Defendant's unfair acts have a negative effect on competition."

### 3.

In their reply memorandum, Defendants maintained that Tatibouet and Brewbakers' declarations were insufficient because "Plaintiffs' 'two expert witnesses' admitted in their respective depositions that they have no idea of whether the Pacific Beach Hotel or the Pagoda Hotel gained any type of competitive advantage as a result of their service charge distribution practices," because they could not identify any particular hotels over which Defendants had gained a competitive advantage.

At a hearing on November 17, 2010, the court granted Defendants' motion for summary judgment as to Gurrobat's claim under HRS §§ 480–2 and 480–13. The court reasoned that Gurrobat's experts failed to raise a material fact regarding the "nature of the competition" because he did not identify any competitors who were harmed by the Defendants' practices:

> The Court agrees with [Defendants'] position here. The standards are provided in *Davis v. Four Seasons.* Basically the plaintiff must <u>still allege and prove antitrust injury by alleging the nature of competition in order to ensure that the injury results from a competition-reducing aspect or effect of defendant's behavior.</u>

> It's not that plaintiffs don't have a basis or a cause of action to raise. The Court is ruling basically on there being no material issue of fact with regard to the evidence

stated that eventually, all hotels would have to pay the same effective wage, it would appear that the benefits to the non-compliant hotel are temporary.

**8.** Brewbaker also stated that during the "ensuing adjustment process it is possible ... for persistent economic rents to arise from cheating, <u>at the expense of other [hotels'] returns.</u>" (Emphasis added.) However, Brewbaker did not explain how the competitive advantage gained by the

non law-compliant hotels would impact the returns of the other hotels.

**9.** Tatibouet did not explain <u>how</u> the competitive advantage would translate into decreased revenues and profits for hotels that obey HRS § 481B–14. Inasmuch as Tatibouet stated that Hawai'i consumers are "price sensitive," he may have assumed that law-compliant hotels would lose income due to price competition.

that will be introduced to support the anti-competitive injury aspect of the case.

And specifically foundationally the Court believes that the expert or the plaintiff's two experts had to have at least a foundation in fact or evidence of one or the other of the following:

One, that there was another hotel that either did not require service charges or required service charges and then distributed 100 percent of them to its service employees or disclosed the withholding to its customers. And basically the two experts had no knowledge of an existent market at all or the existence of any hotel that could provide either one of those two.

On that basis, the opinions were not minimally based on facts. And for that reason, the defendant's motion is granted.

(Emphases added.) The result reached by the court was essentially consistent with this court's decision in *Davis*.

## II.

### A.

In *Davis*, a majority of this court held that plaintiffs alleging a violation of HRS § 481B–14 were required to allege "the nature of the competition." *Davis*, 122 Hawai'i at 438, 228 P.3d at 318. Under this requirement, plaintiffs must show "with some particularity ... actual damage caused by anticompetitive conduct." *Id.* at 439, 228 P.2d at 319 (emphases added) (internal quotation marks omitted). The *Davis* majority rejected arguments that the "deeming" clause in HRS § 481B–4 rendered it unnecessary to prove the nature of the competition because "the requirement that the plaintiff allege the "nature of the competition" ... is derived from HRS § 480–13(a)'s language that 'any person who is injured in the person's business or property by reason of anything forbidden or declared unlawful by [HRS Chapter 480],'" i.e.,

the "causation requirement." *Id.* at 438–39, 228 P.2d at 318–19.

This requirement was said to be consistent with federal case law, which "interpreted the 'injury to business or property' language of section 4 of the Clayton Act as a causation requirement, requiring a showing of 'antitrust injury.'" *Id.* at 439, 228 P.3d at 319 (emphasis added) (internal brackets and punctuation omitted) (quoting *Robert's Hawai'i School Bus, Inc. v. Laupahoehoe Transp. Co.*, 91 Hawai'i 224, 254 n. 31, 982 P.2d 853, 883 n. 31 (1999)). "Antitrust injury" was defined as "'an injury of the type the antitrust laws were intended to prevent, one that flows from that which makes defendants' acts unlawful.'" *Id.* (emphasis added) (quoting *Robert's Hawai'i School Bus*, 91 Hawai'i at 254 n. 31, 982 P.2d at 883 n. 31).

The *Davis* majority further explained that under federal law, to "allege and prove antitrust injury," a plaintiff must "allege the nature of the competition in order to ensure that the injury results from a competition-reducing aspect of the defendant's behavior." *Id.* at 445, 228 P.3d at 325 (emphasis added) (citing *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 341, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990)). Thus, *Davis* held that, based on the "causation requirement" in HRS § 480–13(a), every plaintiff alleging that a violation of HRS § 481B–14 constituted a UMOC under HRS § 480–2 must demonstrate an injury to competition. *Id.*

### B.

In nearly every subsequent case brought by hotel employees, the state and federal trial courts dismissed the plaintiffs' claims under HRS § 481B–14 because the plaintiffs failed to allege the "nature of the competition" as required by *Davis*. *See Villon*, 130 Hawai'i at 149, 306 P.3d at 194 (Acoba, J., concurring and dissenting) (citing cases[10]). In several of these cases, the plaintiffs at-

**10.** The concurring and dissenting opinion in *Villon* cited *Rodriguez v. Starwood Hotels & Resorts Worldwide, Inc.*, CV. No. 09–00016 DAE–LEK, 2010 WL 8938524 (D.Haw. Dec. 29, 2010) (Ezra, J.), *Wadsworth v. KSL Grand Wailea Resort, Inc.*, 818 F.Supp.2d 1240 (D.Haw.2010) (Kay, J.), *Kyne v. Ritz Carlton Hotel Co.*, 835 F.Supp.2d 914 (D.Haw.2011) (Kay, J.), and *Davis v. Four*

*Seasons Hotel, Ltd.*, CV. No. 08–00525 HG–BMK, 2011 WL 5025521 (D.Haw. Oct. 20, 2011) (Gillmor, J.), as cases either dismissing the plaintiff's HRS § 481B–14 claims brought through HRS §§ 480–2 and 480–13 or granting summary judgment against the plaintiff on such claims. 130 Hawai'i at 149, 306 P.3d at 194 (Acoba, J., concurring and dissenting).

tempted to argue that the defendants had harmed competition by charging lower prices as a result of their failure to comply with HRS § 481B–14. However, based on the federal authorities cited in *Davis,* the Hawai'i federal district courts concluded that "where the only effect on competition is lower prices, such lower prices must be predatory in order to result in an antitrust injury." *Wadsworth,* 818 F.Supp.2d at 1267 n. 13, *accord Rodriguez,* 2010 WL 8938524, at *19. Consequently, the district courts concluded that it was "virtually impossible" for hotel employees to enforce a violation of HRS § 481B–14 through HRS §§ 480–2 and 480–13, *Villon v. Marriott Hotel Servs., Inc.,* CV. No. 08–00529 LEK–RLP, 2011 WL 4047373, at *19 (D.Haw. Sept. 8, 2011).

### C.

Thus, nearly insurmountable obstacles resulted from the *Davis* majority's reliance on federal cases "premised on the Supreme Court's conclusion that the purpose of the federal antitrust laws was the protection of competition." *Villon,* 130 Hawai'i at 148, 306 P.3d at 193 (Acoba, J., concurring and dissenting). However, "the legislature's purpose in enacting HRS § 481B–14 was to protect both consumers and employees from the injury suffered when a business retains the service charge for itself but does not inform consumers of this practice[.]" *Id.* at

148–49, 306 P.3d at 193–94.[11] The citation of the *Davis* majority to federal precedent overlooked the fact that such precedent "does not contain any analogous provision to ... HRS § 481B–14 or reflect the same concerns."[12] *Id.* at 149, 306 P.3d at 194 (internal quotation marks and emphasis omitted).

Hence, *Davis* "wrongly imported federal antitrust law into HRS § 481B–14," and "essentially decreed that the purpose of HRS § 481B–14 was to promote competition, even though the purposes of HRS § 481B–14 were broader." *Id.* at 151, 306 P.3d at 196. "As a result, *Davis* established barriers to the enforcement of HRS § 481B–14 through HRS § 480–13" that were contrary to the intention of the legislature. *Id.*

### III.

### A.

Following *Davis,* the majority herein concludes that Gurrobat must demonstrate how Defendants' conduct "negatively affect[s] competition." Majority opinion at ——, 323 P.3d at 812. However, in contrast to the decisions authored by the Federal District Court, *see* n. 10 *supra,* and contrary to the reasoning of the court in its motion granting summary judgment in favor of Defendants, the majority concludes that this requirement is satisfied by showing "that Defendants'

**11.** The *Davis* majority and the majority opinion in *Villon* reached a similar conclusion regarding the legislative history of HRS § 481B–14. The majority opinion in *Villon* stated that "throughout [HRS § 481B–14's] journey through the legislature, the concern for employees was never abandoned," and further stated that "[w]e have previously recognized that 'the legislative history of H.B. 2123 indicates that the legislature was concerned that when a hotel or restaurant withholds a service charge without disclosing to consumers that it is doing so, both employees and consumers can be negatively impacted." *Villon,* 130 Hawai'i at 139–140, 306 P.3d at 184–84 (quoting *Davis,* 122 Hawai'i at 434, 228 P.3d at 314) (emphasis in original). Nevertheless, neither *Davis* nor the majority herein acknowledge the conflict between the recognition that the purposes of HRS § 481B–14 were broader than the promotion of competition and the requirement in *Davis* that plaintiffs allege the "nature of the competition." As explained *supra* and *infra,* because the purposes of HRS § 481B–14 transcend the protection of competition, there is no reason

to require employees, who the legislature intended to protect, to show harm to competition to sue under HRS §§ 480–2 and 480–13.

**12.** Significantly, even some federal courts do not require plaintiffs to allege that they were harmed by a "competition reducing aspect of the defendant's behavior" to demonstrate "antitrust injury" when an action based on section 4 of the Clayton Act is derived from a statute "whose purpose transcends the protection of competition." *Villon,* 130 Hawai'i at 148, 306 P.3d at 193; *see also, e.g., Town Hotels Ltd. v. Marriot Int'l Inc.,* 246 F.Supp.2d 469, 476 (S.D.W.Va. 2003). Similarly, a leading antitrust treatise suggests that it is unnecessary to show injury to competition under such circumstances 2A Areeda et al., *Antitrust Law* § 359 (3d ed. 2007) ("When a plaintiff is one of those that the statute would protect from an alleged violation that does not depend on actual injury to competition, the plaintiff suffers antitrust injury and may recover without showing a detriment to the market." (emphasis added)).

practice of withholding a portion of the service charge without disclosure to customers allowed them to <u>charge lower base prices</u> than law-compliant competitors, thereby <u>reducing 'fair competition'</u> in the market for hotels, restaurants, and banquet service providers." Majority opinion at ——, 323 P.3d at 813 (emphases added). Moreover, according to the majority, "there is no requirement that plaintiffs asserting a claim based on HRS § 481B–14 prove the existence of law-compliant competitors[.]" Majority opinion at ——, 323 P.3d at 812

Respectfully, nothing in *Davis* refers to "fair competition" or supports the conclusion that the "nature of the competition" requirement can be satisfied by a showing of harm to "fair competition." *Davis* also did not suggest that this requirement can be met by showing that defendants may charge lower base prices than their competitors. Rather, the cases cited by *Davis* demonstrate that Gurrobat could not prove that Defendants' conduct had the requisite anticompetitive effect by showing that Defendants could charge lower prices unless he demonstrated that such prices were predatory. *See Villon,* 130 Hawai'i at 149, 306 P.3d at 194 ("[U]nder the federal standard, if the only effect is that a defendant may charge lower prices, the plaintiff must allege that the pricing is predatory in order to demonstrate an 'anticompetitive effect.'") (Acoba, J., concurring and dissenting).

Further, even assuming *arguendo* that harm to competitors in the form of reduced prices could constitute the requisite antitrust injury, inasmuch as *Davis* required plaintiffs to demonstrate "<u>actual damage caused by anticompetitive conduct,</u>" *id.* at 439, 228 P.2d at 319 (emphasis added) (internal quotation marks omitted), it is apparent that Gurrobat could not satisfy the requirements of *Davis* without identifying a law-compliant competitor that was <u>actually harmed</u> by Defendant's conduct.

**B.**

The majority's conclusion that the ability to charge lower base prices suffices to allege "the nature of the competition" is contrary to *Davis.* To reiterate, *Davis* relied heavily on federal precedent, including *Atlantic Richfield* in concluding that plaintiffs were required to allege "the competition-reducing aspect of the defendant's behavior" to meet the "causation requirement" of HRS § 480–13(a). 122 Hawai'i at 445, 228 P.3d at 325. In *Atlantic Richfield,* the plaintiffs were retailers of gasoline and competitors of the retailers of gasoline who purchased their gasoline from the defendant ARCO, a producer of gasoline. The plaintiffs asserted that ARCO instituted a vertical maximum price-fixing scheme [13] with its retailers in violation of section 1 of the Sherman Act. 495 U.S. at 332, 110 S.Ct. 1884. The plaintiffs requested damages under section 4 of the Clayton Act. *See Atlantic Richfield,* 495 U.S. at 333, 110 S.Ct. 1884. Under then controlling precedent, a vertical maximum price-fixing scheme was a per se violation of the Sherman Act. *Albrecht v. Herald Co.,* 390 U.S. 145, 152–53, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), *overruled by Khan,* 522 U.S. at 19, 118 S.Ct. 275. The plaintiffs alleged that by engaging in the vertical maximum price-fixing scheme, ARCO and the retailers had "fix[ed] prices at below market levels." *Atlantic Richfield,* 495 U.S. at 332, 110 S.Ct. 1884.

*Atlantic Richfield* acknowledged that a vertical maximum-price-fixing scheme was a per se violation of the Sherman Act. Nevertheless, the Supreme Court disagreed with the proposition that the plaintiffs "suffered antitrust injury because of the low prices produced by the vertical restraint." *Atlantic Richfield,* 495 U.S. at 338, 110 S.Ct. 1884. According to the Supreme Court, "[t]he antitrust laws were enacted for the protection of *competition,* not *competitors.*" *Id.* (emphases in original) (internal quotation marks removed). Moreover, "low prices benefit consumers <u>regardless of how those prices are set, and so long as they are above predatory</u>

---

**13.** In a vertical price-fixing scheme, the supplier of a product, i.e., gasoline, sets constraints on the price that retailers of that product, i.e., gas stations, can set when they sell the product to consumers. *See State Oil v. Khan,* 522 U.S. 3,

15, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997). In a vertical <u>maximum</u> price-fixing scheme, the supplier informs retailers that they cannot sell a product above a set maximum price.

levels, they do not threaten competition." *Id.* at 340, 110 S.Ct. 1884 (emphasis added). Hence, inasmuch as "antitrust injury does not arise ... until a private party is adversely affected by an anticompetitive aspect of the defendant's conduct," non-predatory low prices "cannot give rise to antitrust injury." *Id.* at 339–340, 110 S.Ct. 1884 (emphases added).

The facts of the instant case are analogous to those presented in *Atlantic Richfield.* As in that case, Defendants' failure to inform consumers that they were not distributing the service charge to their employees was a per se violation of Hawaiʻi antitrust law under HRS § 481B–4. *Davis,* 122 Hawaiʻi at 445 n. 35, 228 P.3d at 325 n. 35. However, the only competition-reducing aspect of Defendants' behavior identified by Gurrobat is the ability to charge lower prices. Under *Atlantic Richfield,* such lower prices "benefit consumers regardless of how those prices are set." 495 U.S. at 338, 110 S.Ct. 1884. Hence, under *Davis,* Gurrobat has not provided sufficient evidence to allege the "nature of the competition." The federal authority adopted by *Davis* therefore renders it impossible for Gurrobat to meet his burden on summary judgment.

Additionally, contrary to the position of the majority, *HMA* does not allow Gurrobat to prove the "nature of the competition" under HRS § 480–13 by simply showing that Defendants' conduct "enables the defendant to create incentives for customers who purchase banquet services from defendants instead of competitors who did not engage in the unlawful conduct." Majority opinion at ——, 323 P.3d at 813. In *HMA,* the plaintiffs alleged, *inter alia,* that the conduct of the defendants, "threaten[ed] the continuity of care provided to patients," and required the plaintiffs to "expend considerable resources seeking reimbursement that could otherwise be available to provide enhanced healthcare services," and made it "more costly and difficult ... to enhance the availability and quality of care that all patients receive." 113 Hawaiʻi at 112, 148 P.3d at 1214. This court noted that such practices would, *inter alia,* "impede or interfere with physicians' ability to provide effective healthcare services to their pa-

tients." *Id.* at 113, 148 P.3d at 1215. In other words, in *HMA* the plaintiffs alleged that the defendants' actions would harm *patients,* i.e., the "consumers" of healthcare. *Id.; see also Wadsworth,* 818 F.Supp.2d at 1268 ("In *HMA,* the plaintiffs had clearly specified the market, as well as a harm to the market and competition in the form of increased prices because of the defendant's behavior." (emphasis added)).

Thus, *HMA* does not contradict the federal precedent suggesting that plaintiffs must show an injury to consumers, rather than competitors, to demonstrate that "the loss stems from a competition reducing aspect of the defendant's behavior[,]" *Atlantic Richfield,* 495 U.S. at 344, 110 S.Ct. 1884, as the majority argues. Consequently, the majority's position that Gurrobat can allege "the nature of the competition" by showing that Defendants can "charge lower base prices than law-compliant competitors" conflicts with the requirements set forth in *Davis.*

### C.

According to the majority, *Davis* concluded that it was necessary to allege the "nature of the competition" to "maintain the distinction between claims of UMOC and [unfair and deceptive acts and practices (UDAP)]." In *HMA,* this court held that when a UDAP claim could also constitute a UMOC, a plaintiff was required to allege the "nature of the competition" to maintain "the distinction between [UDAP claims] and [UMOC claims] that are based upon such acts and practices." *HMA,* 113 Hawaiʻi at 111, 148 P.3d at 1213. However, as opposed to the *Davis* majority, the holding in *HMA* was limited to situations where alleging the nature of the competition was necessary to preserve the distinction between UDAP claims and UMOC claims. *Davis,* 122 Hawaiʻi at 454, 228 P.3d at 334 (Acoba, J., dissenting) (explaining that the "pleading requirement interposed [by HMA] between UDAP and UMOC" was "necessitated in situations where they share a commonality"). In contrast, the majority in *Davis* held that "the pleading requirement [set forth in *HMA* was] based on differences in the nature of the underlying cause of action." *Davis,* 122 Hawaiʻi at 437 n. 26, 228 P.3d at

317 n. 26 (emphasis added) (majority opinion). Thus, the *Davis* majority did not limit its holding to distinguishing between UMOC and UDAP claims as the majority herein relates.

### D.

Also, the majority's position that Gurrobat can allege the "nature of the competition" without identifying any law-compliant competitor cannot be supported under *Davis.* To reiterate, *Davis* held that proving the "nature of the competition" "requires a showing, with some particularity, of actual damage caused by anticompetitive conduct[.]" *Davis,* 122 Hawai'i at 439, 228 P.3d at 319 (internal quotation marks omitted). Plainly, even if lower prices could be used to show anticompetitive conduct, there would be no "actual damage" unless there was a law-compliant competitor who actually lost business due to the lower prices charged by the Defendants. Without proof of the existence of a law-compliant competitor, there would be no harm to anyone other than employees because consumers would receive lower prices and no hotels would lose revenue to other hotels, although all of the hotels would presumably pay their employees less. Insofar as the majority accepts that a "hypothetical" competitor would be sufficient under *Davis,* respectfully this would be incorrect inasmuch as a hypothetical competitor would not be a real entity that in fact suffered "actual damage." Hence, any notion that Gurrobat was not required to prove the existence of a law-compliant hotel also cannot be rationalized under *Davis.*

Thus, the majority incorrectly concludes that "the circuit court erred in granting Defendants' motion for summary judgment because Gurrobat ... satisfied the 'nature of the competition requirements under *Davis.*'" Majority opinion at ——, 323 P.3d at 815. To the contrary, as explained *supra,* a plain reading of *Davis* and the authorities cited therein would have confirmed that Gurrobat was not entitled to recover under HRS

§§ 480–2 and 480–13. *See* Part III B., *supra.* The court cannot be faulted for correctly applying the precedent established by *Davis.*

### IV.

Additionally, the majority states that "*Davis* does not stand for the proposition that in order to recover for an UMOC claim for a violation of HRS § 481B–14, the plaintiff must prove that his or her injury resulted from the negative effect on competition." [14] Majority opinion at ——, 323 P.3d at 814. However, in *Davis,* the majority stated that, due to the "nature of the competition requirement" the plaintiff must demonstrate "that he or she was harmed as a result of actions of the defendant that negatively affect competition." *Davis,* 122 Hawai'i at 438, 228 P.3d at 318 (emphasis in original). *Davis* further characterized this requirement as a "causation requirement" that necessitated the plaintiff show that the injury "reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation[.]" *Id.* at 439, 228 P.2d at 319 (emphases added) (internal citations omitted). Finally, *Davis* explained that under the federal precedent that it relied upon, " 'a plaintiff can recover only if the loss stems from an anticompetitive aspect or effect of the defendant's behavior.' " *Id.* at 325, 228 P.3d at 325 (quoting *Atlantic Richfield,* 495 U.S. at 344, 110 S.Ct. 1884) (emphasis added). Thus, it is apparent from the language of *Davis* that Gurrobat would be required to show that his injury was the result of the anticompetitive effect of the violation.

This conclusion is consistent with the authorities cited in *Davis.* For example, in *Brunswick,* the plaintiffs alleged that the defendants acquired several failing bowling centers, and that due to these acquisitions, the defendant was large enough "to lessen competition in the market it had entered by driving smaller competitors out of business." 429 U.S. at 481, 97 S.Ct. 690. However, the plaintiffs were only harmed because the de-

---

**14.** However, the majority opinion also appears to state that such a showing is required inasmuch as the majority states that Gurrobat was required to show that his injury "flows from the defen-

dant's conduct that negatively affects competition or harms fair competition." Majority opinion at ——, 323 P.3d at 814 (emphasis added).

fendant prevented the acquired centers from failing, thereby ensuring that those centers continued to compete with the plaintiffs. *Id.* Thus, inasmuch as the plaintiffs were not harmed by any reduction in competition, but rather an increase in competition, the Supreme Court concluded that the plaintiffs could not demonstrate "antitrust injury."

In other words, in *Brunswick*, the plaintiffs attempted to demonstrate a negative effect on competition by showing that the defendant could drive smaller competitors out of business.[15] Nevertheless, the plaintiffs could not show that their injury resulted from that negative effect. This failure led the Supreme Court to conclude that the plaintiffs could not satisfy the "antitrust injury" requirement.

The majority, on the other hand, asserts that *Davis* does not require plaintiffs to show that they were harmed as a result of the anticompetitive effect of the violation because this would be contrary to the holding in *Davis* that "the plaintiff need not be a consumer, a competitor of, or in competition with the defendant in order to have standing under HRS § 480–13(a)." Majority opinion at ——, 323 P.3d at 814. However, the issue of whether the employees could bring a UMOC claim at all was not at issue in *Davis*, in as much as HRS § 480–2(e) clearly states that any person can bring a UMOC action. Nevertheless, to reiterate, *Davis* concluded that plaintiffs must demonstrate that they were "harmed as a result of actions of the defendant that negatively affect competition." *Davis*, 122 Hawai'i at 438, 228 P.3d at 318 (emphasis in original). In contrast, it was pointed out that the result of this holding was to "preclude enforcement of HRS § 418B–14 though HRS §§ 480–2 and 480–13." *Villon*, 130 Hawai'i at 149, 306 P.3d at 194 (Acoba, J., concurring and dissenting).

In sum, the language of *Davis* and the authorities it cited confirm that plaintiffs must not only show that an act has an anti-competitive effect, but that they were harmed "as a result" of the actions that negatively affect competition. Consequently, respectfully, the majority's conclusion to the contrary based on *Davis* is incorrect.

## V.

The majority ultimately concludes that Gurrobat "satisfied the test set forth in *Davis*" because he "produced declarations from two experts ... [Tatibouet and Brewbaker,] who opined that any hotel that complies with the law by distributing the entire service charge has higher labor costs and pricing structure and is therefore at a competitive disadvantage [to] a hotel that does not comply." Majority opinion at ——, 323 P.3d at 813.

Thus, proof of the nature of the competition, as the majority sees it, rests on Gurrobat's experts. The majority contends that "proof of how a defendant's conduct negatively affected competition does not necessarily require expert testimony[.]" Majority opinion at 58. However, in the instant case, the only evidence that Defendants' conduct enabled them to charge lower prices or negatively affected competition at all was provided by Tatibouet and Brewbaker's reports. The majority does not provide examples of how Gurrobat could satisfy this requirement without resort to expert testimony.

Respectfully, the majority's reliance on the reports of Tatibouet and Brewbaker in concluding that Gurrobat demonstrated harm to "fair competition" will impose unnecessary barriers to employees seeking to recover treble damages under HRS § 480–13 for violations of HRS § 481B–14. Unlike in the instant case, not all plaintiffs will be a representative of a class action or a member of a class, and not all employees injured by their employer's failure to distribute a service charge to them as tip income will be able to secure and to afford experts to establish an impact on competition.[16]

---

**15.** *Brunswick* did not discuss whether this was actually sufficient to show a negative effect on competition.

**16.** The majority argues that it is not necessary for Gurrobat to prove that the Defendants "lowered their prices or that [the Defendants'] con-

duct injured other hotels[,]" but only that Defendants' "conduct is harmful to fair competition." Majority opinion at ——, 323 P.3d at 813. However, it is not indicated how Defendants' conduct affected "fair competition" other than that Defendants' conduct "allowed them to charge lower

Plainly, under the statute, the legislature "deemed" that a violation was sufficient to establish a UMOC. HRS § 481B–4. Thus, there is no reason under the plain language of the statute to continue to require employees to make any showing of harm to competition to recover under HRS §§ 480–2 and 480–13 for violations of HRS § 481B–14. *Villon,* 130 Hawai'i at 151, 306 P.3d at 196 (Acoba, J., concurring and dissenting); *Davis,* 122 Hawai'i at 458, 228 P.3d at 338 (Acoba, J., dissenting).

## VI.

However, the majority still maintains that a plaintiff "can recover under HRS §§ 480 and 480–13 for violations of HRS § 481B–14, if the plaintiff alleges and proves (1) a violation of HRS Chapter 480; (2) an injury to the plaintiff's business or property that flows from the defendants conduct <u>that negatively affects competition or harms fair competition;</u> [17] and (3) proof of damages." Majority opinion at ——, 323 P.3d at 814 (emphasis added). In doing so, the majority relies on testimony elicited from Gurrobat's experts. Inasmuch as this is an appeal from an order granting summary judgment, presumably on remand a trial will be held on whether there was an "anticompetitive injury" based on the experts' declarations. *See* majority opinion at ———————, 323 P.3d at 814–15.[18] Brewbaker and Tatibouet's reports reveal the difficulties that may be experienced by Gurrobat and future plaintiffs in proving at trial (as opposed to at a hearing on summary judgment) that a violation of HRS § 481B–14 negatively affected competition. It would seem foreseeable that opposing expert testimony may be offered to establish that there was no "harm to fair competition" as the result of a violation.

## VII.

In any event, a showing of the nature of the competitive injury is not and should not

be required. HRS § 481B–14 provides that a hotel or restaurant must either distribute service charges to employees or disclose to consumers that it is not doing so. Thus, when a hotel or restaurant (1) does not distribute service charges directly to employees, and (2) does not disclose to consumers that the service charge is not used to pay the wages and tips of employees, it "violates" HRS § 481B–14. *See Davis,* 122 Hawai'i at 447, 228 P.3d at 327 (Acoba, J., dissenting).

The statutory language of HRS § 481B–4 and HRS § 481B–14 plainly mandates that a violation of HRS § 481B–14 is "deemed" a UMOC, <u>without requiring additional proof,</u> and plaintiffs may therefore receive treble damages under HRS § 480–13 via HRS §§ 481B–4 and 480–2 on evidence that HRS § 481B–14 was violated. The statutory text evinces a manifest intent by the legislature to allow those who have suffered a violation under HRS § 481B–14 a cause of action to enforce their rights under HRS § 480–13 without a showing of injury to competition among the employers. *Id.*

Respectfully, the majority approach still poses a barrier that is inconsistent with the legislative intent manifested in the plain language of the statute that "once a plaintiff employee or consumer has alleged and proved that a hotel or restaurant violated HRS § 481B–14, damages under HRS § 480–13 may be recovered." *Villon,* 130 Hawai'i at 151, 306 P.3d at 196 (Acoba, J., concurring and dissenting).

## VIII.

Based on the foregoing, I respectfully concur and dissent.

---

base prices than law-compliant competitors." Majority opinion at ———–——, 323 P.3d at 813–14.

17. In doing so the majority relies on *Davis'* requirement of demonstrating a "negative affect on competition," and on harm to "fair competition" addressed in the discussion *supra.*

18. The majority contends that there are "no issues with respect to" whether Gurrobat demon-

strated a negative effect on competition. Majority opinion at ——, 323 P.3d at 815. However, on any future motion for summary judgment or at trial, Defendants will be entitled to obtain opposing expert testimony. Thus, such issues may become apparent during the proceedings on remand.